AMERICAN REALTY COMPANY, In Equity

*vs.*

EVERETT E. AMEY et als.

Cumberland.   Opinion October 20, 1922.

*Knowledge of such facts as would lead a fair and prudent man, using ordinary
caution, to make further inquiries, makes such person chargeable, as a matter of
law, with notice of ascertainable facts by ordinary diligence, if he fails to make
such inquiry.   In absence of agreement, power of an agent is restricted
to acts beneficial to the principal, and parties dealing with an agent,
having knowledge that such agent's interests in the matter are
adverse to those of the principal are charged with the duty
to ascertain agent's authority, and they will not be
permitted to plead ignorance of agent's want of
authority, as a matter of law.   Declara-
tions of an agent are no evidence as to
the extent of his authority.*

If a party has knowledge of such facts as would lead a fair and prudent man,
using ordinary caution, to make further inquiries, and he avoids the inquiry, he
is chargeable with notice of the facts which by ordinary diligence he would
have ascertained.

An agent has no power to use his office otherwise than for the benefit of his
principal, in the absence of an agreement that it may be so used.

When parties deal with an agent in a matter affecting his principal, and know that
the interests of the agent in the matter are adverse to those of his principal,
they are charged with the duty of ascertaining that the acts of the agent are
authorized by the principal, and they will not be heard to say that they were
ignorant of the agent's want of authority.

Under such circumstances the duty is imposed upon them to make inquiry as a
matter of law, and as a matter of law they are chargeable with knowledge which
could have been obtained by inquiry.

Inquiry of the agent alone is not sufficient to justify failure to make further
inquiry.   The declarations of an agent, although accompanying his acts, con-
stitute no evidence of the extent of his authority.

On appeal by plaintiff.   This is a bill in equity seeking to charge
defendants as trustees of certain property for the benefit of plaintiff
and to hold them accountable to the plaintiff for the profits derived by

them from the purchase and sale of certain personal property, water rights and timberland properties comprising approximately 20,000 acres of woodland. The defendant Amey was an agent of plaintiff company at its offices in Portland, Maine, for several years prior to the summer of 1917. He never knew anything about the properties in controversy until they were called to his attention in August, 1916, by another agent of plaintiff by the name of Danforth. Amey instructed Danforth to obtain an option for the plaintiff which he did do in the name of the plaintiff for the sum of $200,000 and delivered the option to Amey. Afterwards, Amey fraudulently misrepresented, it is alleged, to the officers of the plaintiff company the true value of the property covered by the option. While the option was in full force and effect, plaintiff alleged, that Amey entered into negotiations with defendant Barnjum and through Barnjum with defendant Hunt for the purpose of making an agreement with them that the three should purchase said properties for their joint benefit each to contribute a stated portion of the purchase price and the profits to be divided pro rata, according to the percentages of the purchase price agreed to be contributed by the respective parties to the agreement. Afterwards, while the option was in full force and effect, defendant Amey, while still agent for plaintiff and acting in its name entered into negotiations with the parties who gave the option to obtain a more favorable purchase price, and succeeded in reducing it to $170,000. Pursuant to the agreement between defendants Amey consummated the transfer of the properties to defendant Hunt upon representations to owners of said properties that they should be conveyed to Hunt under the option for the benefit of plaintiff. Before the conveyances were made of the properties to Hunt, Amey had advised plaintiff against the purchase of the properties. After the conveyances were made to Hunt, defendants sold a part of the real estate, and thereafter, Amey, while still the agent of plaintiff, but acting for the interests of the defendants, sold portions of the balance of the properties to plaintiff company for $238,000, and during the period of the negotiations for the sale, and at the time of the sale, to plaintiff, Amey was agent for plaintiff and as such agent notified the plaintiff of the opportunity to make the purchase and advised plaintiff to make the purchase. The case was heard on bill, answer, replication and proof and the sitting Justice sustained the bill against all the defendants, and made numerous findings of fact

and rulings of law, and plaintiff appealed. Appeal sustained with additional costs. Decree in accordance with opinion.

The case is fully stated in the opinion.

*Weeks & Weeks and Woodman, Whitehouse & Littlefield and Raymond S. Oakes*, for complainant.

*William R. Pattangall and Carroll N. Perkins*, for respondents.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, JJ.

MORRILL, J. The American Realty Company is a subsidiary of the International Paper Company, maintained by the latter company as a part of its organization for securing and maintaining an adequate and constant supply of wood for its mills. On September 25, 1916, the defendant, Amey, was, and for a long time prior thereto had been, employed by American Realty Company with title of "Assistant to the President"; he was attached to the company's office in Portland, Maine; his immediate superior was the president of the company, Mr. George M. Stearns; his duties, as stated by Mr. Stearns, were "to prepare business that the president should do and didn't have time to do perhaps. We would have a conference today and discuss various things, and I might ask him to prepare the business the next time I came around. I very seldom was here in Portland at our office more than two or three days at a time, three or four times a month, and we would discuss these various things today and he was to bring me an answer the next visit I came here."

"Q. Was he instructed by you in relation to being on the lookout for any good propositions?

"A. Always. We were always looking for timberlands; we never had enough. You see, the International Paper Company uses sixty or seventy thousand cords a year, and it is a large amount of wood and we had . . . . we were always looking for timberlands.

"Q. Whether or not he was instructed or permitted by you to conduct preliminary negotiations and even secure options to bring in to submit for your approval at times?

"A. That was what I used to ask him to do, to look over these things and bring them in in concrete form, if he could, for the action of the executive committee, not to purchase anything without asking the executive committee.

"Q. You say that he was not authorized to complete any purchase? A. Oh, no.

"Q. Without the action and approval of the executive committee? "A. No."

As stated by himself, Amey's duties were, "principally to provide wood for the mills in Maine and New Hampshire" . . . . "by buying and operating on their lands, cutting wood on their lands and buying from . . . . buying wood."

We shall have occasion later to inquire as to Barnjum's and Hunt's knowledge of Amey's authority and duty.

In August, 1916 Amey learned from one Danforth, who was then superintendent of the Bangor Division of the American Realty Company's operations, that certain property in Aroostook County owned or controlled by the Stockholm Lumber Company, known as the Milliken lands, might be purchased. We here quote from the very comprehensive findings of the sitting Justice as to the successive steps by which the transactions which are the subject of this suit were completed.

"In 1916 a part of these lands was owned by the Stockholm Lumber Company and a part by the Northern Realty Company. Certain water rights connected with them were owned by the Little Madawaska Improvement Company. All of the stock of the Stockholm Lumber Company was owned by Charles A., Carl E., and M. P. Milliken; all of the stock of the other two said corporations was owned by the Stockholm Lumber Company, except the director's qualifying shares which were held by the Millikens.

"On September 25th 1916 William B. Danforth, the plaintiff's agent, acting under the direction of the defendant E. E. Amey, who occupied the position of assistant to the president of the American Realty Company, negotiated for and received a written option running to the American Realty Company for the purchase of all the said Milliken lands, except 500 acres in the east half of 15 range 4 (Westmanland) for $200,000. The option also included water rights, a stock of goods owned by the Stockholm Lumber Company and certain mill machinery and other personal property. The option was executed by the three corporations. By its terms it expired on October 25th 1916, except that a further time expiring November 10th 1916 was provided in order to close deal when option accepted.

"On October 14th 1916 Danforth still acting under the direction of Amey met the Millikens at Bangor and secured an oral modification of the option, reducing the purchase price to $170,000, and providing that all the lands should be conveyed including the 500 acres excepted in the written option. At this conference Danforth orally accepted the option and in behalf of the American Realty Company agreed to take the property.

"On October 30-31 the transaction was closed at the plaintiff's office in Portland. At the time and place of closing there were present C. A. and C. E. Milliken, Danforth, Amey, R. W. Shaw and C. L. Andrews. Before closing a further modification was agreed to. The store, stock and tenement houses of the Stockholm Lumber Company were agreed to be taken out of the option and retained by that corporation and $18,000 deducted, reducing the purchase price to $152,000. This sum was paid in three checks signed by the defendant Barnjum.

"By direction of Amey the transfer was made not to the American Realty Company but to the defendant, W. D. Hunt. The vote of the corporation authorizing the sale contains this clause "said William D. Hunt being the person indicated by the said American Realty Company as the person to whom said real estate is to be conveyed as provided in said option."

\* \* \* \* \* \* \* \*

"It also appears that while the payment was made directly by Barnjum's checks, the money was furnished, $137,000 by Hunt for Barnjum and himself jointly and $15,000 by Hunt for Amey, Hunt being afterwards reimbursed for the $15,000 by Barnjum's check. To state this more explicitly Hunt sent Barnjum a check for $155,000. This with the $15,000 to be supplied by Amey making up the $170,000 which was the consideration contemplated by the option as amended in Bangor, and before the $18,000 deduction was made which was only agreed upon at the Portland meeting on October 30-31.

"Of this $155,000, $152,000 was used to pay for the deed and assignments. The case shows that $3,000 was returned by Barnjum to Hunt and that subsequently a $15,000 check for Amey's part was sent by Barnjum to Hunt.

"The case also shows that a deed was given by Hunt to Amey covering 15-152 of the property received. It does not appear whether this deed was recorded or not. Certain letters passed between Barnjum and Hunt showing an agreement that after Hunt had

received out of the property $137,000 being balance of investment with interest the 137-152 held by Hunt was to be divided equally between Hunt and Barnjum.

"No express arrangement was made to cover the contingency of possible loss."

In the Spring of 1917 a part of the property conveyed to Hunt in the preceding October for $152,000 had been sold, and Amey then called the property to the attention of Mr. Stearns, President of the American Realty Company, and recommended its purchase for $238,000. The recommendation described the property as "the town of Westmanland and a small interest in Cyr Plantation consisting of 20,000 acres." The recommendation was approved by Mr. Stearns, and by Mr. Russell, Vice President of the American Realty Company, and $238,000 was sent to make the purchase, which the parties ineffectively attempted to complete by deeds dated March 14, 1917.

The plaintiff claims the right to void these acts of Amey on the ground of fraud, known to, and participated in by Barnjum and Hunt, and that the defendants should be compelled to give the plaintiff the full advantage of the purchase by defendants under the option above referred to, as subsequently modified; that the defendants should be compelled to render a full and complete account of sales by them to parties, other than the plaintiff, of any part of the so-called Stockholm property acquired by Hunt under the transaction of October 30-31, 1916, and the monies derived therefrom; and that the defendants should be compelled to pay to the plaintiff the difference between $170,000 and $238,000.

The record before us comprises seven hundred and seventeen printed pages; the sitting Justice made very comprehensive findings of fact and rulings of law occupying eighteen pages of the record, and covering every phase of the case as presented to him.

As to Amey's fraud he held:

"Amey acted for the plaintiff company in purchasing from Hunt (March 14, 1917) property in which he had a personal interest. Amey was the only person connected with the plaintiff company who had any knowledge of such interest, and he failed to disclose the fact. It is clear and is conceded that this conduct was constructively fraudulent.

"However innocently his title was derived Amey cannot be permitted to retain any part of the profit thus acquired.

"But Amey's conduct was not merely constructively fraudulent. As agent for the plaintiff he had an option by virtue of which the plaintiff company was given the right to purchase the Milliken Lands. In turning over to Hunt the privilege of purchasing this land, for the benefit of Barnjum, Hunt and himself, Amey was guilty of actual and intentional fraud. He perhaps did not conceal the existence of the option. From some source Russell knew about it early in October. But he (Amey) took pains to conceal his own favorable opinion and the grounds of it. Planning to acquire the property for himself and his associates he with fraudulent intent disparaged it to the plaintiff's officers. He falsely stated to the Millikens in substance that the conveyance to Hunt was with the assent and for the benefit of the plaintiff Company. He said that Hunt "is one of our men." The letter of November 7, 1916 is full of intentionally misleading statements.

"The evidence of Amey's intentional and deliberate fraud is so plain that it is unnecessary to quote from the testimony or make further reference to it."

As to the participation of Barnjum and Hunt in Amey's fraud the sitting Justice said:

"Hunt and Barnjum received and now hold nine tenths of the profits derived from Amey's fraud, Amey himself having been content with one tenth. But I find no evidence that Hunt and Barnjum or either of them participated in Amey's fraudulent purposes, or had actual guilty knowledge of his fraudulent misrepresentations. If they are liable in this action they have become so through

1. Failure to convey to the plaintiff the property which it paid for.
2. Failure to make inquiry when fairly put upon their inquiry.
3. Frauds committed by Amey as partner or agent.

"The defendants did not convey to the plaintiff all the property which it paid for and is entitled to. It is however perfectly clear that this was not due to any fraudulent design, but to carelessness on the part of both seller and buyer.

"The plaintiff may have a decree that the defendants be required to complete the conveyance of the property for which it paid."

The careful and learned Justice then considered the other grounds of liability suggested, and decided them adversely to the plaintiff.

He then entered a decree providing for confirming the title of the plaintiff to all the property purchased and paid for by it in March 1917, and giving judgment against Amey for "the amount of profit which accrued to him from the transaction with interest," fixed at $11,151.37 with interest from March 14, 1917. From this decree plaintiff has appealed.

In an elaborate brief counsel for plaintiff contend, that the sitting Justice erred in matters of law in six rulings upon which the decree appealed from was based. In the view which we take of the case, it will be necessary to consider only one of those rulings:

"That Hunt and Barnjum were not put upon their notice to make inquiry whether the plaintiff proposed to take up the option before they entered into an agreement with Amey to purchase the property for themselves."

In our judgment the right of the plaintiff to maintain this action against Barnjum and Hunt must depend upon the correctness of the ruling on this point.

Upon this point the sitting Justice held:

"The plaintiff urges that Hunt and Barnjum 'were put upon their notice to make inquiry whether the company proposed to take up the option before entering into a partnership with Amey to purchase it for themselves and should be charged with the knowledge which they would have obtained if they had faithfully made the inquiry.'

"I have found and now repeat that there is no evidence showing Hunt and Barnjum to have had actual guilty knowledge of Amey's frauds. Failure to convey all the property was plainly an inadvertence.

"Was it their duty to make further inquiry before joining with Amey in the purchase?

"The transaction was an unusual one. They were buying property upon which to their knowledge the plaintiff had an option. They were paying nothing to the plaintiff for its option, although Amey expressed confidence that the stumpage was worth about three times the option price, and he a subordinate officer of the company was joining with them in the purchase. They made no examination or exploration of the property. For the desirability of the purchase they relied upon Amey and the plaintiff's explorer. They made no examination of title. For the validity of the title they relied upon an examination made by the plaintiff.

"But it should be borne in mind that—Amey in 1916 enjoyed in a remarkable degree the confidence of the plaintiff's officers, and of the public, that the defendants paid for the property a price which certainly was not manifestly inadequate, and that while the plaintiff had been a large buyer of wood and stumpage, it had not for some years bought woodland in the State of Maine.

"In view of these facts I find that the peculiar circumstances of the purchase as above outlined are not in and of themselves sufficient to put the defendants upon their further inquiry."

In *Knapp* v. *Bailey*, 79 Maine, 195, at Page 204, this court has said: "As to what would be a sufficiency of facts to excite inquiry, no rule can very well establish; each case depends upon its own facts. There is a great inconsistency in the cases upon this point."

Certain facts disclosed by the testimony of Barnjum and Hunt, in addition to those so concisely stated by the learned Justice, throw much light upon the situation and enable us better to visualize the transaction. It clearly appears that Barnjum had known Amey since 1912 or 1913; that on their first meeting Barnjum was favorably impressed with him; that they became on intimate terms personally; that Barnjum addressed him by his first name, and signed letters to him by his own first name; that extending over the period from 1913 to 1916 Barnjum had dealings with American Realty Company, in which Amey acted for the company; during that period Barnjum and Amey had various transactions between them with reference to purchases of lands by Barnjum as sources of wood supply for American Realty Company, and during that period Barnjum knew that Amey's duties were "principally providing the wood supply for the mills, either by buying stumpage or wood;" that he "sometimes handled the negotiations, preliminary negotiations for procuring stumpage or wood or permits, and bringing them up for final approval by the executive committee."

Barnjum was also on friendly and intimate business relations with Mr. Stearns, Amey's immediate superior, President of American Realty Company; he testifies:

"Q. In transacting your business with the American Realty Company were you at their office in Portland more or less? A. Yes, quite often.

"Q. How often should you think  .  .  .  .  or rather, how many times a year, perhaps?

"A. Oh, perhaps I went . . . . very often, when I was in Portland I would go in and shake hands with Mr. Stearns or Mr. Amey, whether I had any business with them or not. It would be very hard for me to say how many times, but I should say six or eight or ten times a year perhaps."

It further appears that Barnjum furnished no money for the original transaction, and "no express arrangement was made to cover the contingency of possible loss," as found by the sitting Justice. He testifies:

"He (Amey) called me up on the phone one day and said that they had been offered the Stockholm Lumber Company property, and he had put it up to Mr. Stearns and Mr. Stearns had turned it down and said they were not buying any lands, and he said that it was too good a proposition to lose, and he wanted to know if I wouldn't like to take it up. · I told him that I would talk it over with Mr. Hunt, and at that time I was so well invested up that I didn't have the funds, and if Mr. Hunt would furnish the money I would be very glad to look into it."

· He did look into it and on October 21, 1916, addressed a letter to Hunt in which the following occurs: "This land that I have just bought through Amey is particularly attractive for two reasons," which he states; then he proceeds, "If you think you would like to join me in this deal, you shall certainly have the first refusal, as it would be an added pleasure to have you in it with us.

"The total price we are to pay for the entire property is $170,000, of which Amey puts in $15,000, reducing our investment to $155,000 . . He is coming to Boston Tuesday, therefore I should be glad to hear from you Monday, so that we may decide just whom to take into the proposition." Hunt thought that he would like to join Barnjum in the deal, and Barnjum decided to take him into the proposition to the extent of the entire purchase price less Amey's $15,000, making with Hunt the agreement referred to in the findings for an equal division of profits. This position of Barnjum in the matter is very illuminating upon the question whether he and Hunt were put upon their inquiry to ascertain the attitude of the plaintiff toward the valuable option of which they were having the benefit.

Hunt, also, knew of Amey; knew that he was an agent of the plaintiff, that he had to do with timberlands; he had participated with Amey and Barnjum in at least one previous deal; Barnjum

discussed the proposition with him and "repeated just the story that Mr. Amey put up to me," as Barnjum testifies. Hunt therefore knew that Amey was participating in a deal in which his interest was adverse to the interest of his principal.

On October 31, Barnjum arrived in Portland with Hunt's money and paid the entire purchase price, later receiving $15,000 from Amey. So far as the record shows he did not ask for a copy of the vote of the stockholders of the Stockholm Lumber Company, authorizing the sale, which would have disclosed to any prudent business man the signs of Amey's fraud. The explanation given by Barnjum and Hunt in the record may well impress the reader as unsatisfactory when offered to support their position of innocent participators in a transaction saturated with Amey's fraud.

We are not, however, considering whether the findings of fact are so clearly wrong as to require reversal, but whether there is error in the rulings of law.

In *Knapp* v. *Bailey,* supra, it is said: "The doctrine of actual notice implied by circumstances (actual notice in the second degree) necessarily involves the rule that a purchaser before buying should clear up the doubts which apparently hang upon the title, by making due inquiry and investigation. If a party has knowledge of such facts as would lead a fair and prudent man, using ordinary caution, to make further inquiries, and he avoids the inquiry, he is chargeable with notice of the facts which by ordinary diligence he would have ascertained. He has no right to shut his eyes against the light before him. He does wrong not to heed the 'signs and signals' seen by him. It may well be concluded that he is avoiding notice of that which he in reality believes or knows." Barnjum and Hunt had knowledge of an "unusual transaction" as described in the findings; they knew that Amey was an agent of American Realty Company acting for the company in a transaction in which he had a personal interest adverse to the interest of his principal; having opportunity at hand through Barnjum's intimate personal relations with Mr. Stearns, to make inquiries, they failed to do so.

Amey's statement that he had put the offer up to Mr. Stearns and that the latter had turned it down is not sufficient to justify failure to make further inquiry. *Cordova* v. *Hood,* 17 Wall. 1, 21 L. Ed., 587. *Moores* v. *Citizens Nat. Bank,* 111 U. S., 156, 28 L. Ed., 385, 389. *Salene* v. *Queen City Fire Ins. Co.,* 59 Ore., 297, 116 Pac. 1114.

*M. & M. Nat. Bank* v. *Ohio Valley Furniture Co.*, 57 W. Va., 625, 50 S. E., 880. *Wilson* v. *LeMoyne*, 204 Fed., 726. *Beach* v. *Osborne*, 74 Conn., 415.

In *Farrington* v. *South Boston Railroad Co.*, 150 Mass., 406, at Page 409, it is said: "An agent cannot properly act for his principal and himself when their interests are adverse, and any person dealing with an agent in a matter affecting his principal, and knowing that the interests of the agent are adverse to those of his principal, ought to be held to the duty of ascertaining that the acts of the agent are authorized by the principal." To the same effect; *Moores* v. *Citizens Nat. Bank*, 111 U. S., 156, 28 L. Ed., 385. Mechem on Agency, Sec. 754.

In 21 R. C. L. at Page 910, Section 87, it is said: "Whenever it appears that the interests of an agent and those of his principal are necessarily in opposition in a particular transaction, strangers dealing with the agent are charged with notice of his want of authority to bind the principal by his acts." In support of this statement, *Langlois* v. *Gragnon et al*, 123 La., 453, 49 So. 18, 22 L. R. A. (N. S.), 414, is cited, in which it is said: "The principle of law which comes into play in such a case is the following: 'In matters touching the agency, an agent cannot act so as to bind his principal, where he has an adverse interest in himself.' Story on Agency, Sec. 210. As a corollary to that principle, where from the circumstances of the particular business, the agent's interest and that of his principal are necessarily in opposition, third persons are charged with notice of such want of authority."

Again, in the following section (88) of the same work it is said: "Every agency is subject to the legal limitation that it cannot be used for the benefit of the agent himself, or of any person other than the principal, in the absence of an agreement that it may be so used; and, as this is a matter of law, and not of fact, all persons must take notice of it." In support of this statement, *Salene* v. *Queen City Fire Ins. Co.*, 59 Ore., 297, 116 Pac., 1114, Anno. Cas. 1916 D, 1296, 35 L. R. A. (N. S.), 438, is cited, in which it is said: "The plaintiff (a mortgagee and holder of a policy in defendant corporation, issued to her by one Rowland) knew that Rowland (the agent) was the owner of the property to be insured, and also knew that he was undertaking to act as the agent of the company in his own interest as against that of the company in the transaction. She knew that

Rowland was providing a security for the possible payment of his debt out of the funds of the company. Aware of all these things, she dealt with him at her peril; and, if she would recover from the company, she must bring home to the latter knowledge of the whole transaction before any liability arose upon the policy, and further show that it approved or ratified the same, having such knowledge. The law imputes to her knowledge of the legal effect of the agent's operating in his own interest and adversely to the principal whom he claimed to represent."

In *M. & M. Nat. Bank* v. *Ohio Valley Furniture Co.*, 57 W. Va., 625, 50 S. E., 880, 70 L. R. A. 312, where an agent admitting the agency, represented that he had secured authority to use the proceeds of a note which he offered for discount, the court said: "The declaration on the part of the holder, after having admitted the agency, that he had secured the right to use the note for his own benefit, calls for the application of another principle of the law of agency, which is a limitation imposed by law upon the power of every agent, general or special, of which all persons must take notice, namely that an agent has no power to use his office otherwise than for the benefit of his principal. When he undertakes to exercise it for a purpose which can in no way benefit his principal but will benefit himself or some third person, he places himself in a position in which the law determines that he is outside the scope of his agency, and the person who deals with him in such a position will not be heard to say that he was in ignorance of the want of authority, for ignorance of law excuses no man. . . . . The declarations of an agent, although accompanying his acts, constitute no evidence of the extent of his authority."

In *Dowden* v. *Cryder*, 55 N. J. L., 329, it is said: "It is a universal principle in the law of agency that the powers of the agent are to be exercised for the benefit of the principal and not of the agent or third parties. 1 Amer. Lead. Cases (5th Ed.), 687. Persons dealing with one whom they know to be an agent and to be exercising his authority for his own benefit, acquire no rights against the principal by the transaction."

In *Cordova* v. *Hood*, 17 Wall., 1, 21 L. Ed., 587, Mr. Justice Strong uses this language: "Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge with

the duty of using them are, in equity, equivalent to knowledge itself. Had inquiry been made of the vendor, it would easily have been ascertained that a portion of the purchase money remained unpaid. Inquiry of Hood, the debtor, if any such inquiry was made, was an idle ceremony''

In *Vredenburg* v. *Burnett*, 31 N. J. Eq., 229, the Vice Chancellor thus states the principle: ''Whatever puts a party upon inquiry amounts in judgment of law to notice, provided the inquiry became a duty and would lead to a discovery of the requisite fact by the exercise of ordinary diligence and understanding,'' adopting the language used in *Lodge* v. *Simonton*, 2 Penrose & Watts, 439, 445, quoted with approval in *Hopkins* v. *McCarthy*, 121 Maine, 27, 30.

The facts of the instant case bring the position of Barnjum and Hunt directly within the application of the doctrine of the foregoing cases. They knew of Amey's agency and that they were buying property on which the plaintiff had an option, and that the option was a valuable one . . . . ''too good a proposition to lose;'' Amey was to have an interest in the property when bought, and to contribute $15,000, on which his share of the profit would be ''quite considerable for him.'' Clearly Amey's interests were adverse to the interests of his principal. By these facts Barnjum and Hunt were put upon inquiry, not of Amey of whom inquiry was an ''idle ceremony,'' but of the officers of the plaintiff corporation. This they did not do, but hurried the transaction through upon the statement of Amey that he had put the proposition up to Mr. Stearns and that it had been turned down. They made no inquiry as to the vote whereby the stockholders of Stockholm Lumber Company directed its Treasurer to convey the property to Hunt instead of the plaintiff. We think that, knowing that Amey was acting in a matter in which he was personally interested adversely to his principal, the duty was imposed upon them to make inquiry, as a matter of law, and that as a matter of law they are chargeable with knowledge which could have been obtained by inquiry. Upon due inquiry they would have learned that Amey had not informed the President of the Company fully and in detail of all that he knew concerning the property (a fact which Amey in his testimony admits), that he had deliberately deceived the Vice President of the Company in regard to the cruise and the value of the property, that the officers of the company were not informed as to the result of the cruise and the terms of the modi-

fied option; and that while Amey had been directing a cruise of the property and an examination of title ostensibly for the benefit of the company, he had been planning by deliberate misrepresentation to secure the benefit of this valuable option for himself and his associates.

In *Hudson Structural Steel Co.* v. *Smith & Rumery Co.*, 110 Maine, 123, this court said: "Notice sufficient to put one upon inquiry imposes upon him such a degree of diligence as will enable him to ascertain the truth, and in failing to do so he will be charged with the knowledge he ought to have obtained by reasonable investigation."

In *Wood* v. *Carpenter*, 11 Otto., 135, 25 L. Ed., 807, it is said: "There must be reasonable diligence and the means of knowledge are the same thing in effect as knowledge itself."

The bill must be sustained against Barnjum and Hunt, as well as Amey, for an accounting. They acquired no rights against the principal by the transaction. *Dowden* v. *Cryder*, supra. Having discovered the fraud practiced upon it the plaintiff is entitled to follow the property and its proceeds into the hands of those chargeable with knowledge of the fraud.

The only remaining ground of defense which requires mention is the alleged settlement of Amey's liabilities to the plaintiff. This contention was not mentioned in the answers.

The sitting Justice ruled that it was incumbent on the defendants to prove that the payment of $169,500 by Amey (in property of that agreed value) and of $10,000 by his father, John T. Amey, was in full discharge of all Everett E. Amey's civil liability in the Dunn-Lumbert, Van Dyke, and Milliken-Dole matters, and also in the Milliken-Westmanland transaction, which is the subject of this suit. "This," he says, "has not been satisfactorily proved," and after a full discussion of the evidence he concludes, "I feel entirely clear that the defendants have not sustained the burden of proving that the transaction involved in this case was settled at the New York conference."

Counsel have not challenged the ruling as to the burden of proof; it was manifestly right. To the finding of fact the usual rule must be applied (*Gilman* v. *Haviland*, 114 Maine, 303), and upon a careful review of the record we cannot say that the conclusion of the sitting Justice is clearly erroneous. The testimony, coming from men of the highest integrity, was squarely conflicting. The only memorandum

of the conference was made and produced by Mr. Russell who testified against the contention of defendants.   We think that the decision must rest where it has fallen.

The plaintiff is entitled to a modification of the decree below, with additional costs.   The modified decree will provide that the defendants, and each of them, make and execute deeds and other instruments necessary to convey and transfer to the plaintiff all property acquired by the defendants, or either of them, by the transaction of October 30-31, 1916, now in their hands or under their control jointly or severally.   The decree will specify the deeds and instruments necessary.

The defendants as joint purchasers are ordered to account for and pay to the plaintiff the amount of profit which has accrued to them from said transaction, with interest.   The exact amount will be specified in the decree, and if counsel cannot agree upon the amount, the cause will be committed to a master to determine the same, and execution against them jointly will issue therefor.

> *Appeal sustained with additional costs.   Decree in accordance with this opinion.*