HAYNES *vs.* LINCOLN TRUST COMPANY.
THOMPSON *vs.* LINCOLN TRUST COMPANY.
HOBBS *vs.* LINCOLN TRUST COMPANY.
PHILIP SHEDD *vs.* LINCOLN TRUST COMPANY.
VERA SHEDD *vs.* LINCOLN TRUST COMPANY.
BROWN *vs.* LINCOLN TRUST COMPANY.
LINTON *vs.* LINCOLN TRUST COMPANY.

Penobscot.   Opinion, October 26, 1944.

*Randolph A. Weatherbee,*

*Fellows & Fellows, by Frank G. Fellows,* for the plaintiffs.

*James E. Mitchell,*

*Edgar M. Simpson,* for the defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, MUR-
CHIE, CHAPMAN, JJ.

MANSER, J. On report. The defendant, Lincoln Trust
Company, organized under State laws, is a country commer-
cial bank with savings department. Its Treasurer, William M.
Noddin, acted as manager. There were five employees. None
of the directors lived nearer than fifty miles to the town of
Lincoln.

Noddin, in addition to his employment in the bank, car-
ried on the business of purchasing and selling lumber on his
own account, in which business the bank was in no wise con-
cerned.

The plaintiffs in the seven cases presented were all creditors
of Noddin in connection with his personal affairs. Because
of the similarity in the facts, and which involved substanti-
ally the same principles of law, the cases were presented in
one record for determination.

The situation in each case arose from the conduct of Nod-
din in manipulating entries in the books and records of the
Bank, and by the issuance of bank statements or memoranda
designed to show that the debts owed by him to the plaintiffs
were paid, and the amounts thereof ostensibly credited to the
deposits of the plaintiffs in the Bank.

Noddin had a personal checking account with the Bank,
and in the cases of the plaintiffs Haynes, Thompson, Hobbs
and Brown, he drew his own checks, which were deposited by
the recipients, either personally or by mail, to be credited to
their checking accounts in the same Bank. The plaintiff, Vera
Shedd, a sister-in-law of Noddin, was induced by him to al-
low a withdrawal from her savings deposit in the Bank as a
temporary loan to Noddin. As security, Noddin delivered a
deed of real estate executed to her by the wife of Noddin's
business partner. Later Noddin returned the deposit book
with the entry of a credit by him of the amount borrowed

plus interest. The deed was turned back to him and remained with his personal papers in the Bank.

The plaintiffs, Philip Shedd and William Linton, each made temporary loans to Noddin, who later credited the amounts to their checking accounts in the Bank.

Actually, Noddin never used his own funds in any of these transactions. While he had a personal checking account with the defendant Bank, his balance was never sufficient to pay any of the checks he drew connected with the matters now under consideration, and they were worthless. Receiving the checks as deposits in his capacity as Treasurer, he then immediately concealed the deposit slips and checks with his own papers, and the checks were never cleared on the records of the Bank. The transactions covered a period of several months, during which time Noddin first falsified the monthly statements sent out to the plaintiffs who had checking accounts, to make it appear that their actual balance included the amounts of his ostensible payments. Later, he secretly charged certain large inactive accounts of other depositors with withdrawals equalling the false entries he had made, and entered the sums upon the accounts of his creditors. From that time on, the books of the Bank and the monthly statements apparently reflected that the plaintiffs were entitled to the sums involved in the present suits and for which they now claim the Bank is indebted to them. The aggregate of the amounts in controversy is $9,179.37. In addition, one plaintiff, Thompson, had received from Noddin checks totalling over $6,000, and had made withdrawals, reducing his balance to $3,941.24, the sum for which he brought suit.

None of the fraudulent acts were known to the plaintiffs, or the directors, or other employees of the Bank. When they came to light, an audit was made, and the plaintiffs were all notified that they would not be allowed to withdraw any sum which would affect the amounts credited to them by Noddin, as recited above. While they continued to receive

from the Bank monthly statements which, on their face, gave them credit for the withdrawals made by Noddin on inactive accounts, they knew that such funds were not available for their use, and that the rights of the parties awaited judicial determination. There is no dispute as to the facts.

The contentions of counsel for the plaintiffs may be summarized as follows:

The plaintiffs were all innocent parties. They were unaware of any fraud on the part of the Treasurer of the Bank, and they were in no way put upon notice thereof.

The Treasurer was permitted to have a checking account with the Bank, and when another depositor received his check and deposited it in the same Bank and received credit therefor, the Bank was charged with knowledge as to the status of the account of the maker of the check, and acceptance thereof by its Treasurer was the equivalent of a deposit of cash.

When a depositor deals with the sole representative officer of a bank, the knowledge of that officer is the knowledge of the bank.

When a bank holds out its Treasurer to the public as worthy of trust and confidence, and enables him to convince the depositors that its transactions are within his power, the bank is liable.

A credit entered on the account of a depositor's pass-book, and likewise monthly statements which include the credit, are admissions on the part of the Bank that such sum is due the depositor.

The sending out of monthly statements of certain of the plaintiffs, after discovery of the fraud, constituted as to each of them an account stated.

As generalizations, most of these contentions are supported by judicial authority, but the claim of applicability fails to recognize essential elements here present.

These we proceed to consider. No case involving the exist-

ent situation appears to have been passed upon by our Court, but the tenor of our decisions, is in accord with the many jurisdictions where such issues have been decided. The factors, not existing in most of the decisions urged as precedents, are that the plaintiffs dealt with Noddin as a principal in transactions between them. Here when an assumed adjustment took place, Noddin acted in a dual capacity as principal and also as agent and representative of the Bank. In the latter capacity, he committed fraudulent acts without the knowledge of his employer, to make it appear by false bank entries that he had paid his debts.

Under such circumstances, did the Bank become liable?

Plaintiffs seek to apply the fundamental rule that where one of two innocent parties must suffer by the wrongful act of a third, he who gave the power to do the wrong must bear the burden of the consequences. This is a correct general statement of a universal approved principle. It is without application here, as the plaintiffs were dealing with Noddin on his own personal business, and the Bank gave him no power or authority to pay his own debts with its funds. Under such circumstances, the duty rests on the plaintiffs to ascertain that he is using his own funds, and not misappropriating those of his employer. The burden may appear onerous, and not in accordance with popular concept, but it gives effect to the only safe rule. The general principle would have application if the Treasurer were acting, not as principle in his own business, but solely as agent for the Bank. Then, if he accepted as good a worthless check drawn on the Bank by another depositor, the Bank might be liable, because the Bank, by its recognized agent, has the knowledge, or means of immediate ascertainment, of the status of the account of such depositor.

Again, what are the "consequences" of his act which are to be borne either by the creditor of Noddin or by the Bank? The debt has not been paid. The creditor is in the same situa-

tion as before the fraudulent act of Noddin was committed. He has the same right of action against him as he had then. The debtor may be bankrupt and the claim against him of no value, but there has been no change in legal status as between the principals in the transaction, and it would be an ominous and dangerous rule to hold that a bank can give its treasurer license to steal its own funds or those entrusted to it by other depositors to pay his own debts.

The great weight of authority supports the views here expressed.

Upon the general proposition that the treasurer of a corporation cannot draw notes and checks of the Company, payable to himself, and signed by him as treasurer, and use them to pay his personal obligations, our own Court in *Gilman* v. *Carriage Co.*, 125 Me., 108, 131 A., 138, 139, held:

> "While the treasurer's authority to *sign* the notes and cheques in suit cannot be questioned, he presumptively had the right to *negotiate* them for corporate purposes only.
>
> Even his authority given by vote to issue and indorse paper gave him no right to use it to pay his individual debts."

In *Langlois* v. *Cragnon*, 123 La., 453, 49 So., 18, 22 L. R. A. N. S., 414, the plaintiff loaned money to the cashier of a bank. When the loan became due, the parties agreed that the cashier should make a deposit in the bank to the credit of the plaintiff. Later, a check was drawn for part of the deposit, which check was paid. The position taken by the plaintiff was that the duty of making entries on the books of the bank was exclusively that of the cashier, and when informed by him that the deposit had been made to the credit of the plaintiff, the bank became liable therefor, and further honoring of checks drawn on the deposit constituted notice

of the transaction, from which ratification is deducible. The Court disposed of these contentions thus:

> "We answer that the bank is not responsible. The effect of holding it to be responsible would be to permit the agent to pay his debt by saddling it on his principal. It stands to reason that such a thing cannot be legal. The principle of law which comes into play in such a case is the following: 'In matters touching the agency, an agent cannot act so as to bind his principal, where he has an adverse interest in himself' Story, Agency, No. 210.
>
> As a corollary to that principle, where, from the circumstances of the particular business, the agent's interest and that of his principal are necessarily in opposition, as in the present case, third persons are charged with notice of such want of authority.
>
> The notice which is thus imputed to Rev. Langlois cuts him off from invoking the rule that, whenever one of two innocent persons must suffer by the acts of a third, he who enables such third person to occasion the loss must sustain it.
>
> In fact, Rev. Langlois not only cannot claim to have been an innocent third person, but, by the statement of facts, does not show affirmatively that he suffered a loss. He does not show that, but for the deception in question, he could have made his claim out of Pellerin. For all that appears, Pellerin may not have had a dollar to his name."

This case is cited with approval as to principles concerning agency in *Realty Co.* v. *Amey*, 121 Me., 545, 118 A., 475.

*Hier* v. *Miller*, 68 Kan., 258, 75 P. 77; 63 L. R. A., 952, has been widely cited and may well be regarded as a leading

authority. The position taken by the present plaintiff was vigorously and cogently advanced, but the holding of the Court is well summarized in the headnotes as follows:

."The cashier of a bank organized under the laws of this state has no implied authority to pay his individual debt by entering the amount of it as a credit upon the pass-book of his creditor, who keeps an account with the bank, and permitting the creditor to exhaust such account by checks which are paid, the bank having received nothing of value in the transaction.

If the cashier of a bank, without actual authority so to do, undertakes to pay his individual debts in the manner stated, the bank may recover of his creditor the amount of money paid on checks drawn upon the faith of the unauthorized pass-book entries.

The fact that the cashier is personally interested in a transaction of the character described is sufficient to put his creditor upon inquiry as to the actual extent of the former's power."

Again, in *Cobe* v. *Hardware Co.*, 83 Kan., 522, 112, P. 115, 31 L. R. A. N. S., 1126, the Court said:

"Neither the cashier nor a stockholder of a bank can by any device or fraud give away its funds, nor can they use them to pay their individual debts to appellee or anyone else. Appellee had overdrawn its account with the bank and was indebted to it . . . . 'The funds of the bank could not be diverted or appropriated to the individual debts of Devlin or the cashier by the mere agreement between Devlin and the appellee to enter a credit in its favor. The appellee

had paid nothing to the bank, and the bank had received nothing to warrant such a credit.' "

It might be argued that the principles enunciated in the decisions establishing the rule that a bank officer cannot pay his personal obligations with funds of the Bank, without authority from the Bank so to do, generally deal with facts which show that credit was given by the officer by means of a deposit slip, an entry in depositor's pass-book, or by a cashier's check drawn on the Bank, and that there should be an exception to the rule, where, as here, in some instances, he drew his own personal check, and therefore his creditor had a right to assume that he was paying his debt from his own funds on deposit in the Bank.

It is the opinion of the Court, that this does not affect the applicability of the general rule. *In Columbia Bank* v. *Morgan,* 198 Wis., 476, 224 N. W., 707, the same situation was discussed. There the cashier handed to his creditor his personal check for the balance of his indebtedness to her, and she endorsed it and returned it for deposit, but there, as here, the cashier abstracted the check and the records of the bank did not disclose it. He used devices to make it appear that the assets of the bank were fully intact.

In the above case the Court quoted copiously from *Hier* v. *Miller,* supra, and commented on this difference in facts, but adhered to the same rule, saying:

> "The result of the transaction was that the defendant received the moneys of the bank, which in equity and good conscience belonged to it, and for which it received no consideration."

So in *Schwenker* v. *Parry,* 204 Wis., 590, 236, N. W., 652, the Court reaffirmed the principle enunciated in the *Columbia Bank* case, supra, in particular because its soundness was questioned, and concluded:

"We hold, on grounds of sound public policy, that when a bank cashier delivers his personal check on his bank to a person for the purpose of paying his debt, such person takes the check at his peril and without recourse against the bank unless the cashier has funds on deposit with which to meet the check. Payment of the check, by the cashier, as an officer of the bank, should not be held to close the transaction."

For further authorities see *Campbell* v. *Bank*, 67 N. J. L. 301, 51 A., 497, 91 A. S. R. 438; 9 C. J. S., Banks and Banking, Sec. 202 and cases there collated; *Greer* v. *Farmers Bank*, 174 Okl., 46, 51 P. 2d. 792; *State* v. *Thedford Bank*, 114 Neb., 534, 208 N. W., 627; 7 Am Jur., Banks, Secs. 226, 227. With particular regard to the rule admitting evidence contra to entries in bank books, reference is made to the decisions of our own Court in *Northrop* v. *Hale*, 72 Me., 275, and *Savings Bank* v. *Fogg*, 83 Me., 374, 22 A., 251.

Counsel for the plaintiff appears to rely on *Pemiscot Bank* v. *Tower Grove Bank*, 204 Mo. App., 441, 223 S. W., 115, as authority for the contention that checks drawn by cashier on his own bank in payment of personal debts, do not carry notice to his creditor concerning his authority, but the Court there pointed out facts which took that particular case out of the rule relating to the issue of checks by a cashier in payment of his personal indebtedness, and cited its own decision, *Bank* v. *Edwards*, 243 Mo., 553, 147 S. W., 978, as supporting such general rule, which it there speaks of as "rigorous but wholesome."

Specifically we hold in accordance with the well established rule, that the treasurer or cashier of a bank is only its agent, and his conduct is governed by the general law of agency. Hence, the Bank is bound, so long as he keeps within the scope of his authority, but is not answerable if he acts beyond his authority or in his individual capacity. *Home Bank*

v. *Otterbach*, 135 Iowa, 157, 112 N. W., 769, 124 A. S. R., 267, with cases cited in annotations. *State* v. *Bank of Manchester*, 6 Smedes & M., 218 (Miss.), 45 Am. Dec., 280; *Realty Co.* v. *Amey*, 121 Me., 545 at 556, 118 A., 475.

Recurring to the contention of the plaintiffs that after they received notice that an audit of the Bank's affairs had shown discrepancies and that the Bank could not allow any withdrawals of the sums now in question, yet some of the plaintiffs later received monthly statements which included them, and as to those plaintiffs, such statements thereby became accounts stated. The facts warrant no finding that liability for a definite sum had been agreed upon, the balance ascertained to be correct, and an express or implied promise given to make payments. These elements are necessary to support an account stated. Notwithstanding the receipt of monthly statements, it was always understood that the plaintiffs could not make withdrawals, that liability was disputed, and that the issue was to await judicial determination; *Pride* v. *King*, 133 Me., 378, 178 A., 716; *Holmes* v. *Morse*, 50 Me., 102; 1 Am Jur., Accounts and Accounting, Secs. 31, 32; 7 Am. Jur., Banks, Secs., 461, 462.

Neither is there merit in the claim on behalf of Vera Shedd that the Bank became liable to her because it did not deliver to her the deed which was deposited with her by Noddin as security and which she later returned to him, when he credited her savings account with the amount he had borrowed. There is no evidence of an assertion of right of retention of this deed by the Bank, and none of demand or request by the plaintiff for its delivery to her. The Bank was not a party to the transaction and apparently the plaintiff relied solely on her claim of right to recover from the Bank, and awaited its determination.

The entry in each of the cases must be

*Judgment for the defendant.*