[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON REQUEST FOR INJUNCTIVE RELIEF
This is an action against Gerald Pawlich, an insurance salesman, to enforce a three year ban on competition for certain customers. The promise not to compete appears in two successive one year employment contracts between the parties. The plaintiffs maintain, however, that this case does not concern itself merely with a restrictive covenant arising out of an employment contract. They claim the defendant sold his insurance business to the plaintiffs and he in effect is now retaking assets he previously sold.
There is no dispute that some two and a half years after he began working for the plaintiffs, the defendant left, taking what he claims are "his" accounts to another agency. He has since worked these accounts. They were customers with which the defendant had a long relationship and they followed the defendant to his new agency.
Now the plaintiffs say as the result of the defendant s actions they have suffered irreparable harm, have no adequate CT Page 1531 legal remedy and therefore seek a temporary injunction.
The underlying facts are in large measure, though not entirely, undisputed.
Mr. Pawlich and Mr. Gildersleeve, his partner, ran an insurance agency for several years. There came a time when business started to deteriorate and the agency was unable to pay its debts to various insurance companies. The partners then tried to sell their agency to raise cash to settle the debts and in the Fall of 1991 started talking to Arthur Noll. At that time Mr. Noll who had been an independent insurance agent worked under an employment contract for Hilb, Rogal 
Hamilton Company of Hartford which is a subsidiary of Hilb, Rogal Hamilton, an out of state insurance brokerage firm.
After preliminary discussions, Noll gave Mr. Pawlich a written "Asset Purchase Proposal" in October 1991. A short time later Noll gave Pawlich a draft "Agreement of Purchase and Sale" which provided for a sale of accounts and other assets. Both partners were to work for Hilb-Hartford and the price for the transfer of the assets was to depend on the amount of business generated by the transferred accounts over a two year period. If the accounts generated no more than $230,000 Pawlich and Gildersleeve were to be paid the equivalent of fifty eight percent of those commissions. The agreement also indicated that a condition precedent to performance by Hilb-Hartford was that Pawlich and Gildersleeve at or prior to the closing on the transfer of assets had to enter into an employment agreement and covenant not to compete with Hilb-Hartford.
Pawlich found that the agreement was acceptable as to purchase price for the assets but before the transaction could be consummated Pawlich had to deal with the insurance company creditors. A meeting was held with these parties and Mr. Noll was present. Pawlich wanted his creditors to compromise their claims and represented that permitting this transaction would be the only way they could recover anything on their claims. The companies refused to accept these arrangements and thus to permit a direct asset sale by Pawlich to Hilb-Hartford.
Mr. Noll claims the parties next discussed a so-called "Purchase Managing and Servicing Agreement (Ex. 3). This agreement made the "sellers," Pawlich and Gildersleeve, still CT Page 1532 responsible for the insurance debt and required that Hilb-Hartford be indemnified for these liabilities and allowed the latter to offset any payments made on these debts against sums it owed to the "sellers." At trial Mr. Pawlich denied having seen this document and has denied that he was considering any type of asset sale at this point.
The employment agreement Pawlich eventually entered into with Hilb-Hartford was dated January 18, 1992. He read the agreement (Ex. 4) and his lawyer saw it; Pawlich requested no changes in this agreement. This agreement avoided continued responsibility for pre-existing insurer debt and the related contractual indemnity.
The agreement had an initial term of one year and compensation was to be fifty percent of commissions earned on the Pawlich accounts brought to the plaintiff and at the end of the year the plaintiff claims these accounts would become the property of Hilb-Hartford under the agreement.
In addition to these terms there were a series of independent and severable restrictive covenants one of which the plaintiffs seek now to enforce. That covenant says that for a period of three years after termination Pawlich couldn't directly or indirectly "approach contact, or solicit, or continue to allow himself to be approached or contacted by, any individual or firm which was a customer or prospective customer of the employer with whom employee had personal contact while in the employ of the employer for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the employer during employee's term of employment." The agreement defines a "customer" as an individual or firm for whom there is insurance coverage in force as of the date of the defendant's termination. A "prospective customer" is defined as parties known by the employee to have been solicited by the employer within one year prior to the employee's termination.
In his first year Mr. Pawlich earned between $36,000 and $45,000 from his fifty percent commission from the accounts. He testified he did not believe he brought in any new accounts and presented no evidence at this hearing of having done so. Mr. Pawlich had severe health problems during the first year. CT Page 1533
The second year, 1993, Pawlich was given a new employment contract providing for a $30,000 salary with a chance to earn a bonus for new accounts. This agreement (Ex. 5) contained the same restrictive covenants. Mr. Pawlich brought in no new accounts the second year. He chose to service what remained of his old accounts.
Mr. Pawlich continued to work into 1994 under the terms of the year two (Ex. 5) contract. Pawlich doesn't recall if he brought in new business between January and April 1994.
Mr. Noll testified that he felt this arrangement couldn't go on because Pawlich was continuing to get a salary for merely servicing his old accounts but brought in no new accounts. Noll offered Pawlich a new arrangement of $2,000 each for May and June with $1,000 per month thereafter. Pawlich rejected this and decided to leave with what he claim are his accounts.
Pawlich contacted a Donald Rittman who ran the Stone Agency. The defendant agreed to work at Stone receiving fifty percent of the commissions he generated from his old accounts. After concluding his arrangement with Rittman on April 29, 1994 Pawlich told Noll he was leaving and did. Since then he has contacted his old accounts and all but one followed him to Stone.
This happy result did not appear to come as a surprise to Mr. Pawlich. He testified these people would be loyal to him since he serviced them and it is a business built on cultivating relationships. That is why he told Rittman he'd bring his book of business with him. If he had to compete for this business with Noll he would have an advantage over Noll because of his relationships with the clients.
These are the basic underlying facts. The court will discuss other facts as they become necessary to decide particular legal issues.
The standards to guide a court in considering whether to grant a temporary injunction have been set forth in an opinion by Judge Levine in the case of Connecticut Association ofClinical Laboratories v. Connecticut Blue Cross, 31 Conn. Sup. 110,119 (1973). CT Page 1534
". . . The requirements for a temporary injunction are:
 (1) establishing a legal right, which involves a determination of the probability of the plaintiff succeeding on the merits and that there is no other adequate remedy at law; and
 (2) the imminence of a substantial and irreparable injury to the plaintiff, considered together with the effect of a temporary injunction on the plaintiff and the defendant."
The first question that should be considered is some discussion of the standards the court should apply in applying the general language of Connecticut Association as it applies to the enforcement of restrictive covenants of the type now before the court.
The question before the court then is the enforceability of a restrictive covenant. Some of these arise in connection with contracts of employment, others in connection with the sale of some asset or goodwill. The plaintiffs claim that what we really have here is sale of goodwill, of the Pawlich accounts, or put another way of access to his customers. Whether it is viewed in this way or the restrictive covenants are regarded as ancillary to an employment contact the plaintiffs claim they should prevail.
The plaintiffs point to the above distinction to take advantage of what appears to be a often repeated general rule that . . . . "courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of goodwill than those made in connection with I contracts of employment," Restatement (Second) Contracts, § 188 (b) at page 42. Also see Westec Security Services v.Westinghouse Electric Corp. , 538 F. Sup. 108, 121 n. 19 (E.D., Pa. 1982), Bowen v. Carlsbad Ins. Real Estate, 724 P.2d 223,225 (NM., 1986), Fogle v. Shah, 539 N.E.2d 500, 502 (Ind, 1989), Worldwide Auditing Services v. Richter, 587 A.2d 772,776 (Pa, 1991), cf. Mohawk Maintenance Co. v. Kessler,419 N.E.2d 324, 329 (N.Y., 1981) which extends the protection to the CT Page 1535 buyer beyond even the policy expressed by the general rule just cited.
In Mattis v. Lally, 138 Conn. 51, 54 (1951) a sale of goodwill (barbershop) was involved and the court refers with approval to § 516 of the First Restatement which explicitly defines as a rule what § 188 of the Second Restatement refers to as the general practice of the courts.
In fact the adoption of § 188 and the comment (b) to that section may indicate that the drafters, although noting that courts treat restrictive covenants more leniently in a sale of assets case, did not want the courts to feel bound by the more iron clad § 516 type rule which seems automatically to assume that if there is a sale of goodwill involved there is no unlawful restraint of trade.
In fact the Mattis court itself after referencing § 516 of the First Restatement merrily goes on to review all the facts and weigh all the equities before deciding in favor of the plaintiff who was the purchaser of the barbershop.
When small business people are involved in selling the fruits of their labor as here and as in Mattis, the courts should still look carefully at the equities. When all is said and done there are in fact good policy reasons for courts to scrutinize restrictive covenants less closely when sales of assets are involved. This is done not merely to protect the "buyer" who is trying to enforce the restriction. It is also of benefit to prospective sellers of this type of business goodwill and presumably of benefit therefore to an economy that relies on constant private capital formation to survive. That is, people who work hard to build up customer lists and goodwill shouldn't have the value of their labors diminished in the market place because of unwarranted judicial intervention, cf. Day Companies v. Patat, 403 F.2d 792, 796
(Ca. 5, 1968). Such unwarranted court intervention would run the risk of making prospective buyers wary or concerned about the real value of the asset they are being offered.
In this case there does not seem to be much doubt that the defendant was in effect transferring his accounts to the plaintiff under the terms and restrictions set forth in year one (1992) contract. I can give no other meaning to the wording of the contract especially the last sentence of CT Page 1536 Exhibit A, the attachment to the contract, which says rather explicitly:
 "At the end of the initial term, Employer and Employee shall try to agree upon future compensation levels, which will be partially dependent upon generation of accounts for Employer by Employee during the initial term, which accounts Employee acknowledges will be the property of the Employer."
The restrictive covenant language in the contract defines the scope and ambit from a practical point of view of what can be characterized as a transfer of the accounts.
Throughout his testimony Mr. Pawlich kept saying that he never regarded his negotiations for the year (1) (1992) (Ex. 4) contract as an asset purchase nor did he regard the contract itself as such a purchase. But no specific language in the contract is alluded to for the support of such a position. In fact, the very defense adopted by Mr. Pawlich with the assistance of Mr. Gildersleeve is inconsistent with any notion that Pawlich and of course Noll regarded this contract as anything other than a business sale or transfer of the accounts to the plaintiff. In effect the defense is that at or around the time the contract was signed Noll in effect said to Pawlich you don't have to worry, no one is going to go after your accounts, the last sentence of Exhibit A will never be enforced against you people.
The defense raised seems to characterize the nature of the transaction at least before the Noll statement was allegedly made as a transfer of assets but then tries to offer the court a reason why the transfer shouldn't be enforced.
But even if the court is incorrect in this view of the defense raised by the alleged remarks by Mr. Noll it still rejects the defence [defense] insofar as it represents an attempt to convince the court perhaps on some grounds of equity, that because of Noll's alleged remarks the restrictive covenant shouldn't be enforced.
Noll denies marking this somewhat unusual statement. At the time he was an employee of Hilb-Hartford and absolutely no reason is advanced as to why or under what authority he would CT Page 1537 in effect substantially destroy a large part of the benefits of a contract he had just negotiated for his principal. Pawlich doesn't remember if the statement was made before or after he signed the contract. Gildersleeve is a friend of Pawlich and was his partner for several years; he said the statement was made before the contract was signed. In any event, no consideration passed for this modification of the contract and no claim is made by Pawlich that he in any way relied to his detriment on Noll's alleged statements. He was prepared to sign the contract as written. If Pawlich's and Gildersleeve's story is accepted the contract and its signing was a charade to Hilb-Hartford's detriment and Noll was acting directly against his principal's interest. There is nothing to indicate he had any authority to make such a statement to bind his principal. Furthermore, the general rule appears to be that when the interests of an agent and principle are at odds, strangers dealing with the agent are charged with notice of his or her want of authority to bind the principle, see Consumers Credit Corp. v. Swiley,1238 So.2d 885 (Miss), Central West Casualty Co. v. Stewart,58 S.W.2d 366 (Ky. 1933), cf. American Realty v. Amey, et al, 118 A. 475 (Me, 1922), cf. Restatement (Second) Agency, § 166. This defense is even more unusual than the scenario envisaged in these cases since Noll would have made this statement not for his own interest but just to confer a gratuitous benefit on parties with whom he'd been involved with in an arms length business deal. To sum up, I have difficulty finding Noll made the statement at all, that if he made it he did so before the contract was signed, and what legal difference it would make even if it was made before that point.
The court concludes therefore that what was involved here was a transfer of the Pawlich accounts and a purchase of those accounts by Hilb-Hartford under the terms, conditions, and as defined in the contract.
Rather than turning directly to the merits, the court now will discuss another defense raised by Mr. Pawlich that would apply if the restrictive covenant were merely ancillary to an employment agreement and a purchase of assets was really not involved here. If the court has been incorrect in characterizing this transaction as a sale of goodwill or assets it makes sense to address this defense since if the defense is rejected there would still be reason to address the merits and the parties will avoid wasted time if the matter is CT Page 1538 appealed.
Assuming then that we have and employment contract with restrictive covenants, the defendant argues that Mr. Noll's declared intention to revise Mr. Pawlich's compensation in Thus, the restrictive covenants can't be enforced because there has been a tampering with the contractually mandated compensation by the employer. The defendant cites 54 Am.Jur.2d Monopolies § 570, Felton Beauty Supply Co. Inc. v. Levy,31 S.E.2d 651 (Ga. 1944) Griffin v. Chesney, 269 S.W. 582 (Ark. 1925),Economy Grocery Stores Corp. v. McMenamy, 195 N.E. 749 (Mass. 1935), Public Laundries Inc. v. Taylor, 26 S.W.2d 1085 (Tex. 1930).
A plain reading of the year two (1993) Ex. 5 agreement which appears to govern this issue seems to contradict the defendant's assertion. Paragraph 1 states,
 "Employee's compensation shall be reviewed by employer not less frequently than annually during the term of this agreement and any extensions or renewals thereof may be adjusted upward or downward in employer's sole exercise of its reasonable business discretion."
The contract provides for an annual salary of $30,000 and Exhibit A then says, "Future changes in compensation need not be reflected by amendment hereto as employer may effect such change through signature of a payroll authorization form." If the employment arrangement operated on a yearly basis with a block grant of a $30,000 salary not subject to change once the employment contract was in effect what can this last quoted sentence possibly mean? And what does the previously quoted language from paragraph 1 of Exhibit 5 mean? The employer reviews the salary "during the term of this agreement" (i.e. an employment contract for one year) and can adjust the salary "upward or downward." If the two portions of this sentence are not read in tandem with the addition of "and's what can the language giving the employer the power to adjust the salary really mean especially when read in conjunction with the quoted sentence from Exhibit A?
The defendant makes the further argument that the plaintiff's interpretation of this language authorizing him to adjust salary up or down at his discretion makes the CT Page 1539 compensation agreement "illusory" and belies Noll's position that Hilb-Hartford was purchasing assets. This is not so since the defendant seems to forget the transfer of accounts language in the year (1) contact and the provisions of that contract which do not provide for an annual salary as such but for a percentage of commission earned on the Pawlich accounts. The plaintiff argues this was the consideration for the asset purchase. The defendant can argue that given this enforcement of the restrictive covenants would be unfair and unreasonable from the standpoint of equity enforcement, but that does not make Noll's position that there was an asset purchase self-contradictory insofar as he also claims he had a right to adjust the defendant's salary upward or downward in later employment contract years.
Turning to the merits and the propriety of granting injunctive relief the court must of course keep in mind the general standards of Connecticut Association and apply those standards in light of Scott v. General Iron Welding Co.,171 Conn. 132, 137 (1976) which sets forth various factors trial court's must consider in assessing the reasonableness of an employment based restrictive covenant. The factors are:
(1) The time the restrictive covenant operates.
(2) The geographic area it applies to.
(3) how fair is the covenant to the employer.
 (4) how will it restrain the employee's chance to pursue his occupation.
 (5) the extent to which the public's interest is interfered with.
It the restrictive covenants are "reasonable" under theScott test then the first prong of Connecticut Association
— probable success on the merits — will to a large measure be met. Weiss Associates v. Weiderlight, 208 Conn. 525 (1988) is a case which sustained two separate restrictive covenants against an insurance salesman — a geographical limitation and a two year ban on post termination competition. The plaintiff cites several other cases where geographical competition and temporal restrictions have been discussed by the courts, NewHaven Tobacco Co. v. Perelli, 18 Conn. App. 531 (1989), Hart,CT Page 1540Nininger 2 Campbell v. Rogers, 16 Conn. App. 619 (1988),Torrington Creamery Inc. v. Davenport, 126 Conn. 515 (1940),Roessler v. Burwell, 119 Conn. 29 (1934), May v. Young,125 Conn. 1 (1938), Scott v. General Iron Welding Co. supra.
Although each case is different as to the determination of reasonableness, it can't be said that the restrictive covenants here are unreasonable given the discussion in some of the cited cases. The restriction as to access to these customers is three years; most of the cases approve a two year limitation but Weiss held a five year limitation was not unreasonable.
The fact that the restriction here is customer directed makes it less burdensome than a geographic restriction.
After three years the defendant can go after the customers subject to the restriction.
The three year limit is fair from another perspective. As was brought out in the testimony developing and maintaining insurance accounts is a matter of maintaining relationships with people. Viewing the restrictions as ancillary to an employment contract the three year limitation is not unfair. True Pawlich developed these accounts long before he came to Hilb-Hartford but he was employed at that company for over two years. He used its resources and facilities to nurture and strengthen the relationships that are represented by the accounts he brought to the agency. It is not unfair that there be a three year moratorium during which the employer can try to maintain access to and a business relationship with the accounts Pawlich brought in after the plaintiff gave him a job and a decent rate of compensation. Even if 50% of commissions is not exorbitantly high by industry standards — the rate he received the first year — it is higher than the plaintiffs pay their current salespeople and is certainly not substandard. There is no claim the thirty thousand salary under the year two contract was unreasonable. Thus Pawlich was at least fairly paid for his services while employed by the plaintiffs and used their resources to maintain contacts with these accounts. It is not unfair under these circumstances that there be a three year limitation on Pawlich's ability to solicit these customers. Thus, even if these covenants are viewed as merely ancillary to an employment contract, the three year limitation is not unjust or overly burdensome. CT Page 1541
If the arrangement between Pawlich and the plaintiff's is viewed as a sale or transfer of these accounts to the plaintiffs there is even more basis to say that the three year limitation is reasonable. If, in fact, he sold these assets to the plaintiffs how can he fairly be heard to claim a right to work them in direct contravention of the terms of the sale. Again even if the consideration he received isn't shown to be spectacularly high given his circumstances at the time the initial contract with Hilb-Hartford was entered into and what that agency pays its other salespeople the consideration he received can hardly be characterized as unreasonable or illusory.
Turning to the restraint on the employee's opportunity to pursue an occupation the court cannot say the restrictions placed on the defendant are unreasonable. Using the tests set out in Mattis v. Lally, 138 Conn. at p. 55, there is no indication that this man's ability to earn a living would be destroyed. When he signed these contracts he, at his own admission, was aware of the restrictive covenants and raised no complaint about their terms. Mr. Pawlich is not prevented from conducting his profession or practicing it in any area he chooses. At one point in his testimony he indicated he had recovered his health and now considered himself a "production machine"; he could bring in new business if he had to. True, if the injunction is granted, the defendant's fortunes will suffer but that hardly can be used as a reason to void the legal effect of agreements he willingly entered into with the plaintiffs.
Turning to the public interest factor it is difficult to comprehend that the public will suffer if these restrictive covenants are enforced. No evidence was presented that services similar to what Mr. Pawlich offered wouldn't be available to the public or the particular customers represented by the transferred accounts because the court grants this temporary injunction. No evidence was presented as to how the "public interest" will in any way be affected if the court grants this injunction.
Using the Scott analysis it seems probable to the court that the plaintiffs will prevail on the merits. Turning to other considerations involved in the decision to grant temporary injunctive relief the damage to Noll would appear to CT Page 1542 be irreparable and no adequate or measurable way to ascertain a legal remedy would appear to be available. It is somewhat disingenuous for the defendant to claim in this context that an injunction would be futile since customer relationships are personal so that if Pawlich is deprived of contact with his old accounts he will suffer but Noll won't gain since they will just go to other people. How do we know all that if Pawlich's actions are at least in part the very cause of Noll's inability to develop his own relationships with these customers? Is the solution to allow Pawlich to continue to maintain these relationships in violation of agreements he arrived at and then deny the plaintiffs relief on some theory that the plaintiffs haven't developed in the past and couldn't develop in the future a relationship with these customers because, at least in part, of Pawlich's wrongful acts under his agreements. That would stand the law of injunctive relief as its heard and place a burden on plaintiffs not contemplated by our law.
The plaintiffs are entitled to the injunctive relief they request. As of the date of this order the defendant is enjoined for a three year period from calling on, contacting, or selling to any customers who were customers of his before he joined the plaintiff Hilb, Rogal and Hamilton of Hartford and that became customers of the plaintiff while he was employed by the plaintiff. He is further enjoined from receiving any business from these customers. The court means thereby to enforce by court order paragraph 5(c) of Exhibit 5, the so-called year one agreement.
Corradino, J.