## CORDOVA *v.* HOOD.

1. Where a deed of land shows on its face that the consideration is yet "to be paid," a second purchaser (that is to say, a purchaser from the vendee), who has notice of the deed, takes the land in those States (of which Texas is one) where the English chancery doctrine of a vendor's lien prevails, subject to the vendor's lien, unless such lien has been in some way waived.

2. In the case of such a deed it is the duty of the new purchaser to inquire; and where inquiry is a duty, the party bound to make inquiry is affected with all the knowledge which he would have got had he inquired.

3. Though it is true that taking a note with a surety from the vendee is generally evidence of an intention to rely exclusively upon the personal security taken, and therefore, presumptively, is an abandonment or waiver of a lien, yet this raises only a presumption, and as a presumption only it may be rebutted by evidence that such was not the intention of the parties.

4. The testimony of the vendor received to rebut, and being positive, held sufficient to do so.

5. Where a vendor already has a lien, evidenced by a note for the payment of all and every part of the purchase-money so long as it remains unpaid, the lien for any purchase-money afterwards still unpaid is not lost by the fact of his receiving part payment of the note before its maturity, taking a new note payable at the same time and in the same way and place as the original note, and a destruction of such original one.

6. By the laws of Texas (which in a matter connected with real estate was respected by this court in a suit coming from Texas) an assignment of a note given for the purchase-money of real estate carries the vendor's lien.

APPEAL from the Circuit Court for the Western District of Texas, on a decree dismissing a bill filed to enforce a vendor's lien. The case was thus:

On the 4th of March, 1859, B. G. Shields, by instrument of

writing, " bargained and sold to G. M. Hood" (both parties. being of Texas) a tract of land in that State, described, " for the sum of $27,000, *to be paid* by the said Hood as follows." Certain drafts and notes to be given by Hood were then specified; among the notes one for $9000, payable at the Union Bank, New Orleans, April 9th, 1862. The deed ended with a covenant that " *on the completion of the payments before. mentioned*" Shields would warrant and defend the premises to Hood, his heirs and assigns, against all persons lawfully claiming or to claim them. In point of fact, when the papers came to be executed, the notes were signed not only by Hood, the purchaser, but also by his son, G. M. Hood, Jr. On the 1st of April, 1862, before the note that became due on the 9th matured, Hood, Sr., called on Shields and stated to him that he had some surplus cash with which he desired to pay a part of it off. Shields accordingly took his money, and a new note was executed for the balance; the old note being given up. The new note, like the old one had been, was made payable April 9th, 1862, and at the Union Bank, New Orleans. This new note Shields after-wards (in the autumn of 1862) assigned to one Bartlett.

In May, 1863, Hood sold the land to two persons, named Scroggin and Hanna; and Bartlett having become bankrupt, his assignee in bankruptcy, one Cordova, now filed a bill in the court below against both the Hoods, Scroggin, and Hanna, to enforce the lien. The bill did not allege that the complainant had exhausted his remedy at law against Hood, the vendee of the land, who, or whose estate in point of fact, appeared to be solvent.

The Hoods let a decree pass *pro confesso.* Scroggin and Hanna set up in answer, or in argument, that all vendor's lien had been waived by taking Hood, Jr., as a party, who, not being interested, was a surety on the notes; that even if any lien had existed under or by virtue of the note of $9000,. such lien was waived when that note was *paid,* as in law it was completely when it was surrendered; the transaction having been not a credit on an old debt, of so much cash paid, but an acceptance of cash and of a new

debt, accompanied by an annihilation and extinction of the old one; that, at any rate, however all this might be as between Shields and Hood, they, Scroggin and Hanna, were purchasers, *bonâ fide* and without notice of any lien; that further, if Shields, the vendor, might himself have enforced a lien against the land, had he continued to hold the note and debt, the right of enforcement was a right personal to him, and that it did not pass to Bartlett, his assignee, and as little certainly to Cordova, assignee in a second remove.

Shields, who was examined, thus testified:

"The recital in the instrument executed to G. M. Hood, Sr., on the 4th of March, 1850, corresponds with the facts, except that the name of G. M. Hood, Jr., was also signed to the notes. The land was sold to Mr. Hood, Sr., and his responsibility, coupled with a vendor's lien, secured by the regular form and terms of the instrument, was deemed by me a sufficient security. Mr. Hood, Jr., accompanied his father to my house, and was represented by his father to be his agent. I do not remember why it was that Mr. Hood, Jr.'s, name was signed to the notes. The deed or instrument was prepared, to the best of my recollection, before the notes, and in the absence of Mr. Hood; the notes, after the arrival of Mr. Hood and son. Their joint signatures was probably a suggestion of the moment and did not alter or take from the facts recited in the instrument. Mr. Hood, Sr., did execute the notes to secure the payment of the amounts, and at the time, and for the considerations mentioned in the deed. The additional signature of Hood, Jr., was simply that much more; a gratuity not called for by nor altering the contract. Mr. Hood, Sr., was represented, by those who knew him in Eastern Texas, to be a wealthy man. His son was considered responsible and trustworthy as far as I know. The reason for not taking a mortgage is shown by the terms of the instrument, by which the vendor's lien is plainly retained and held. I have no recollection of who was present when the terms of the instrument securing the vendor's lien were discussed, if discussed at all. There never was any question between us on that point; it being considered, of course, that my obligation of warranty in the instrument would only be made perfect or complete upon the payment of the whole amount of the purchase-money.

"The payment of a portion of the note of $9000 in advance, and taking another note, was simply a matter of convenience, and not intended, in any manner, or to any extent whatever, to impair or affect the lien retained by the terms of the instrument to secure the payment of the whole amount of the purchase-money. It was positively and unequivocally so stipulated and agreed between us at the time of the execution of the said note of $5015; so stated and understood, without question, between us.

"The note was traded to Bartlett, with the statement from me that it was secured by a vendor's lien on the land sold to Hood, Sr. I will further state that I believed at the time that Mr. Bartlett had special reference to that fact in the transaction, and that he felt that the note of G. M. Hood, Sr., to secure the remainder of the last payment for the land, with the right of the vendor's lien upon said land, was safer for him (Bartlett) than cotton, which he gave me for it; then liable at any moment to impressment.

"Both Hanna and Scroggin spoke to me, some time since—perhaps 1868 or 1869—in reference to the terms of sale by me to Hood. I gave them such information as my recollection of the facts warranted. One of them, and perhaps both, stated that they had been informed by Mr. Hood that he had paid the whole amount of the purchase-money; in reply to which I gave them true information, as nearly as I could. At the time there was more than $9000 due."

Bartlett was also examined. He said:

"When Shields sold the note to me, he told me distinctly and positively that it was secured by a lien on the land. This was perfectly understood between us. I relied on this lien when I purchased it."

Scroggin and Hanna were also both examined. They testified that Hood, Sr., was one of the wealthy men in Texas; that they supposed that the land had been sold to him on his personal responsibility; that with his own lips he declared to them that every dollar was paid on the land; that they had never heard of any lien. It appeared, however, on cross-examination that they had seen the record of the deed of March 4th, 1859, from Shields to Hood, before purchasing

from Hood, and had had it examined by their professional adviser for their own " protection."

The court below confirmed the decree so far as the bill was confessed, but dismissed it as against Scroggin and Hanna. From that decree Cordova took this appeal.

*Messrs. Conway Robinson, W. G. Hale, and R. T. Merrick, for the appellants; Mr. G. F. Moore, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The appellees must be held to have had notice of whatever equities were revealed in the line of their title. They claim through a conveyance from Hood, Sr., who had purchased from Shields in 1859, and the deed from Shields plainly exhibited the fact that the purchase-money remained to be paid. It contained not even a receipt for the consideration of the sale. In form it was a deed of bargain and sale, but there was not enough in it to show that the use was executed in the vendee. On the contrary, it recites a consideration *" to be paid "* in instalments at subsequent dates, for which a draft and notes were given. That the vendor, by such a deed, had a lien for the unpaid purchase-money, as against the vendee and those holding under him with notice, unless the lien was waived, is the recognized doctrine of English chancery, and Texas is one of the States in which the doctrine has been adopted.* It is a general principle that a vendor of land, though he has made an absolute conveyance by deed, and though the consideration is in the instrument expressed to be paid, has an equitable lien for the unpaid purchase-money, unless there has been an express or an implied waiver of it. And this lien will be enforced in equity against the vendee and all persons holding under him, except *bonâ fide* purchasers, without notice.† With greater reason, it would seem, should such a lien exist and be enforced when, as in this case, the deed,

---

* Osborn *v.* Cummings, 4 Texas, 13; Neel *v.* Prickett, 12 Id. 138; Briscoe *v.* Bronaugh, 1 Id. 326.

† Mackreth *v.* Symmons, 15 Vesey, 329.

instead of containing a receipt for the purchase-money, expressly states that it remains unpaid.

The important question to be considered, therefore, is whether the lien has been waived. That there was no express waiver by Shields at the time when his deed to Hood was made and delivered, or at any subsequent time, is not only not proved, but is plainly disproved. Shields himself has testified that the lien was never released by him, and that when the note of his vendee for $5015 was taken for the unpaid portion of the larger note given at the time of the sale, it was with the distinct understanding between him and Hood that the payment then made, and the execution of the note for the balance, made no difference whatever respecting the vendor's lien to secure the balance, but " that the land should continue just as liable to secure payment of said balance as before."

It remains then to inquire whether there was any implied waiver of a lien. When the deed was made the vendor took for the purchase-money promissory notes signed not only by Hood, the vendee, but by Hood, Jr., his son. Had the notes been signed by the vendee alone no implication of an intent to waive a vendor's lien could have arisen. It is everywhere ruled that where such a lien is recognized at all it is not affected by the vendor's taking the bond or bill single of the vendee, or his negotiable promissory note, or his check, if not presented or if unpaid, or any instrument involving merely his personal liability.* It is true that, taking a note or a bond from the vendee with a surety, has generally been held evidence of an intention to rely exclusively upon the personal security taken, and therefore, presumptively, to be an abandonment or waiver of a lien. But this raises only a presumption, open to rebuttal by evidence that such was not the intention of the parties.† And we

---

* See numerous cases collected in note 1, Leading Cases in Equity, Hare & Wallace, 235, under the case of Mackreth *v.* Symmons.

† Campbell *v.* Baldwin, 2 Humphreys, 248, 258; Marshall *v.* Christmas, 3 Id. 616; Mims *v.* Railroad Co., 3 Kelley, 333; Griffin *v.* Blanchar, 17 California, 70; Parker *v.* Sewell, 24 Texas, 238; Dibblee *v.* Mitchell, 15 Indiana, 435.

think the evidence in this case clearly shows that neither party to the deed understood that the vendor intended to take the note of Hood, Sr., and Hood, Jr., as a substitute for the lien. The only evidence we have bearing directly upon the subject is in the testimony of Shields. To some extent he does undoubtedly confound his own impressions with what occurred when the notes were given. But we think it may fairly be deduced from his statements that there was no intention then to waive the lien, which the law implied from the terms of the deed. He is unable to state why the son's name was signed in conjunction with the father's, but he is positive that the additional signature was simply a gratuity not called for by the contract nor altering it. He states also there never was any question between himself and his vendee respecting a vendor's lien, adding, it being considered, of course, that his obligation of warranty in the deed would only be made perfect or complete upon the payment of the whole amount of the purchase-money. And that taking the notes as they were taken was not intended as a waiver of a vendor's lien, or at least that it was not understood by the vendee to be such a waiver, is placed beyond doubt by what took place afterwards, on the 1st of April, 1860. There the renewed note was given for a part of the original purchase-money, and it " was positively and unequivocally stipulated and agreed by the vendor and vendee" that the original lien was retained, that the land should continue liable as before. How could this be, if the lien had been waived? Waiver is a thing of intention as well as of action, and it is impossible to believe, in view of this testimony, there was an intention to give up the security of the land. Were this a bill to enforce the lien against the lands in the hands of Hood, the purchaser, it would not be permitted to him to assert that the vendor had, from the first, relied only upon the personal security taken.

And Scroggin and Hanna, the purchasers from Hood, are in no better position. They are not *bonâ fide* purchasers without notice. As we have seen, the lien for the purchase-

money was apparent in the line of their title. The deed from Shields to Hood informed them that the consideration was unpaid. It imposed upon them the duty of inquiring whether it remained unpaid when they were about to make their purchase.* Wherever inquiry is a duty, the party bound to make it is affected with knowledge of all which he would have discovered had he performed the duty. Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself. Had inquiry been made of the vendor, it would easily have been ascertained that a portion of the purchase-money remained unpaid. Inquiry of Hood, the debtor, if any such inquiry was made, was an idle ceremony. The deed pointed to the person from whom purchasers from Hood were bound to seek information.

It has been suggested in the argument on behalf of the appellees, that taking up the original note, and giving another note for an unpaid balance of the first, may have terminated the lien if any existed. Undoubtedly no agreement made in 1860, when the new note was given, created a vendor's lien for its security. But the original lien was for all the purchase-money, and for every part of it so long as it remained unpaid. It was not merely security for the notes first given; it was for the debt of which the notes were evidence. Giving the new note was not payment of the debt, it was only a change of the evidence, and, therefore, the fact that it was given did not affect the lien. In *Mims* v. *Lockett*,† it was held that if a vendor of land takes a note for the price, and subsequently renews it, adding in the new note a sum of money due him by the vendee on a different account, his vendor's lien will not be invalidated thereby.

It has been further argued that even if Shields, the vendor, might have enforced a lien against the land had he continued to hold the note, Bartlett, his assignee, cannot. It is contended that a vendor's lien is a personal right of the vendor himself, not assignable. And hence that the assignee of a note given for the purchase-money cannot resort in equity

---

* McAlpine *v.* Burnett, 23 Texas, 649.          † 23 Georgia, 237.

to the land sold. It must be admitted that such. is the doctrine of very many cases, perhaps of those which have been best considered, though there are many well-reasoned judgments to the contrary. But we think, for the purposes of the present case, the law, as held by the Supreme Court of Texas, must furnish the rule of decision. And the decisions of that court appear to be that an assignment of the notes given for purchase-money carries with it the lien to the assignee.*

It has been held that in order to enforce a vendor's lien, the bill must show that the complainant has exhausted his remedy at law against the personal estate of the vendee, or must show that he cannot have an adequate remedy at law. And this bill makes no such showing. But in Texas, as in some other States, the creditor may proceed in the first instance to enforce the lien in equity.†

Upon the whole, then, we think the Circuit Court erred in dismissing the complainant's bill. He was entitled to a decree.

DECREE REVERSED, and the case remitted with instructions to enter a decree for the complainant against Scroggin and Hanna, the appellees and defendants below.

---

* Moore v. Raymond, 15 Texas, 554; Watt v. White, 33 Id. 425.
† McAlpine v. Burnett, 19 Texas, 497.