## SEYMOUR *et al. v.* SLIDE & SPUR GOLD MINES, Limited.

*(Circuit Court, D. Colorado.* June 17, 1890.)

1. **VENDOR AND VENDEE—CONTRACT—WAIVER OF VENDOR'S LIEN.**
An agreement between vendor and vendee, that, on the payment of a certain sum, the title to the property sold will be registered "free from all charges and incumbrances," is not a waiver by the vendor of his lien for the balance of the purchase money. Such agreement relates to the state of the title at that time, and not to anything growing out of the sale itself.

2. **SAME.**
The facts that a vendor withholds the deed, and afterwards retains possession of the property, and has stock of the corporation to whom he sells the property pledged to secure the purchase money, are not of themselves sufficient to constitute a waiver of his vendor's lien.

3. **SAME—ESTOPPEL.**
A vendee who accepts title and makes part payment, according to the terms of an agreement between the vendor and the broker through whom the sale is made, is estopped to afterwards deny the broker's authority to make the agreement.

In Equity. Bill to enforce vendor's lien.

*Teller & Orahood,* for complainants.
*L. S. Dixon,* for defendant.

HALLETT, J. In 1886 complainants owned a mine in Boulder county, which they desired to sell in England, and they employed John Haldeman, of London, as a broker to make the sale. Haldeman conceived the idea of organizing a corporation to purchase the property, and procured the organization of respondent under the limited liability companies acts of Great Britain for that purpose, apparently with a view to keep the sellers and buyers apart. Haldeman proposed to take the title of the mine in his own name, and convey it to the corporation which should be organized, and thus become a purchaser from complainants, and a grantor to the corporation. Complainants were to sell for $750,-000, of which one-half was to be paid in cash, and one-half in stock of the corporation. The first deed to the property was made to Haldeman, and placed in escrow with Wells, Fargo & Company, of London and the United States, to be delivered on payment of the cash part of the consideration. Respondent was organized in the early part of the year 1887, but nothing of consequence was done towards completing the sale until August 18th of that year, when an agreement was entered into between J. Fenton Seymour, acting for complainants and Haldeman, to the effect that, upon payment of £10,000 in addition to £12,500 paid before that time, Seymour should "register the titles" "free from all charges and incumbrances" in Boulder county; and, furthermore, that Seymour should cause the mine to be worked "to its full capacity," and that the proceeds of the mine should amount to certain sums stated in the agreement, of which the company should have notice by cable. The agreement then proceeds as follows:

"The said J. Fenton Seymour hereby undertakes and agrees to take the control of the management of the said property until the payments hereinafter mentioned are completed, and it is understood and agreed that he shall retain such control until the said payments are completed. The said John Haldeman agrees that 375,000 shares, of one pound each, in the above company, shall be transferred to Mr. Clarence Preston Elder as trustee, and deposited with Messrs. Wells, Fargo & Company in London, to the intent that the said shares shall be held as security for the due performance of the following conditions, viz.: *First,* the payment of 10,000 pounds in addition to the above mentioned 22,500 pounds within three days after the receipt of the third successive weekly return from the mine as hereinbefore mentioned; and, *second,* the balance of 45,000 pounds at the expiration of ten days after the receipt of eight successive weekly returns of the nature and value above specified. Upon the completion of the above-mentioned payments, the said J. Fenton Seymour hereby undertakes and agrees to release the above-mentioned 375,000 shares, less 77,500 to which he is entitled, and also less the number of shares, with the consent and under the supervision of the aforesaid Clarence Preston Elder, acting for the said J. Fenton Seymour. In case the weekly returns cabled from the mine shall from any cause fall below the sum of two hundred pounds sterling per week, then, in that case, such returns shall not count, but the time for paying the second ten thousand pounds and the balance of the forty-five thousand pounds shall be extended *pro rata;* but should the successive weekly returns amount to two hundred pounds sterling per week, with a

moderate increase weekly, as hereinbefore mentioned, and the said John Haldeman shall make default in the payment of the balance of the forty-five thousand pounds, then, in that case, the said J. Fenton Seymour shall have the right to forfeit the amounts already paid, and to claim the above-mentioned 375,000 shares."

There is some dispute as to the result of work carried on by Seymour in the mine under this agreement, complainants claiming that returns were made as required by the agreement, and respondent claiming that the mine fell short of the amount specified in the agreement; but this is not material.    The £10,000 first mentioned in the agreement were paid, and a deed from complainants to the company for the property was placed on record in Boulder county.    This deed, it will be observed, was substituted for that which was first made out to Haldeman, and was then in escrow with Wells, Fargo & Company; and the parties say that this was done for convenience, and to save the necessity of recording two deeds,—one to Haldeman, and another from Haldeman to the company. At all events, the company obtained title directly from complainants. Some small payments were made on the further sum of £55,000, which by the agreement was to be paid to complainants within two or three months thereafter.    Nothing further was done towards completing the sale until October 5, 1888, when a proposition in writing was made by J. Fenton Seymour as agent for complainants to certain persons who had become, or were about to become, stockholders in the company, as follows:

"*First.* In payment of thirty-five hundred pounds to Wells, Fargo & Company, we agree to start the mine at work in name of company.    Said sum to credit of Col. Seymour.    *Second.* Company to send cashier and engineer if they think fit, and Colonel Seymour to be resident manager and director for the period of one year.    *Third.* All proceeds to be transmitted to company bankers.    *Fourth.* Mr. Elder to deliver 75,000 shares to the Scotch subscribers, and forty-five thousand to Mr. Rust on payment of said sum.    *Fifth.* The balance of shares to remain in Mr. Elder's hands as trustee until a final settlement can be made inside of three months after acceptance of this proposition.    *Sixth.* Colonel Wilson, or whoever pays the thirty-five hundred pounds, to receive fifteen thousand shares from Mr. Elder on the final settlement, not later than three months, and meantime receive a legal obligation from Mr. Elder as trustee.    *Seventh.* On resignation of Mr. Elder as a director, Mr. Allen to be elected.    *Eighth.* Thirty-five hundred pounds to be paid so soon as the company can register the transfer of the 75,000 shares."

The £3,500 mentioned in this proposition were paid to complainants, and accepted by them, on the 15th day of December, 1888; and it is sufficiently shown that Seymour thereafter held possession of the property for the company.    An agreement made by Haldeman and one H. E. Gilbert, who, prior to the organization of the company, seems to have been set up as its representative, of date May 16, 1887, and another agreement of date September 10, 1887, between the company, Haldeman, and Gilbert, sufficiently show that the 375,000 shares deposited with Wells, Fargo & Company, and by the agreement of August 18, 1887, transferred to Elder as trustee, were given to Haldeman in pay-

ment for the property, and a principal point in controversy between complainants and respondent is whether they were also accepted by respondents in the same way. It is clear enough, however, that this is not the effect of the agreement of August 18, 1887, for by the terms of that instrument Elder was to hold the shares "to the intent that the said shares should be held as security for the due performance of the following conditions," and then follow the conditions for the payment of the £10,000 and the £45,000; and the final clause which gives Seymour, the right to forfeit the amount paid, and to claim the shares, is only an option in case of default, which complainants were in no way bound to accept.

It is said, however, that the corporation was not a party to this agreement, and that Haldeman was not its agent in making it. Having accepted title according to its terms, and paid some part of the money mentioned in the agreement, the corporation is not now in a position to deny its authority, and the agreement must be regarded as having been made by the corporation or in its behalf, or, at all events, as having been ratified by it. It is also urged that complainants waived their right to a vendor's lien upon sale of the property by taking security for the purchase money,—first, in withholding the deed; afterwards, in retaining possession; and again, by the pledge of shares in the hands of Elder as trustee; and it must be conceded that all these things were done by complainant with a view to secure the purchase money. When the matter was first presented, I was of the opinion that by these acts complainants had waived their lien, and so stated to counsel; but, upon looking into the authorities, I have reached a different conclusion. As stated by respondent's counsel, although resting upon the contract of sale, the lien is quite independent of it, being implied from the contract, rather than expressed in its terms. Where there is no waiver of lien, express or implied, it will be recognized and enforced, and taking security for the purchase money is only presumptive evidence of waiver. 2 Jones, Liens, § 1090. In all that was done by complainants throughout the whole negotiation there is no satisfactory evidence of intention to abandon the property as security for the purchase money. Certainly, in withholding the deed and the possession, they manifested the strongest disposition to hold onto the property until the money should be paid; and, as to the shares of stock, they assumed only a right of possession until the purchase money should be paid. Apparently the stock was to be sold by Haldeman, or by some one connected with the company, and complainants were not bound to do anything in that way. They merely required that the stock should be held by a trustee, subject to sale by Haldeman, until the purchase money should be paid. In this way, also, they were in a sense holding onto the property as security for the purchase money, in so far as the stock represented the property. In *Cordova* v. *Hood*, 17 Wall. 1, it is held that the matter of waiver is to be determined upon all the circumstances of the case; and, if nothing appears to show it affirmatively, the lien may be recognized and enforced.

I find nothing in these negotiations to support the conclusion that de-

fendants intended to abandon the property as security for the purchase money. As a further defense, respondent contends that the lien was waived by that clause of the agreement of August 18, 1887, by which the title to the mine was to be registered "free from all charges and incumbrances;" complainants thereby agreeing to give the company a clear title. This is undoubtedly a correct construction as to antecedent transactions, but it is not to be taken to refer to the negotiation then pending. An agreement to convey without incumbrance means only that the title shall be clear at the date of the agreement. Whatever is incorporated into the agreement, or grows out of it, is not affected by such an obligation. It has never been understood that a vendor's lien is waived by covenants of warranty inserted in the deed of conveyance; and so in this article complainants must be understood as saying that the title which would be given to the company by their deed was free from incumbrance. If the contract had provided for security by mortgage or trust-deed, it would be absurd to say that by the clause under consideration such security would be waived; and this clause has no relation whatever to the vendor's lien.

Further on in the same instrument provision is made for the payment of £55,000 of the purchase money, and so the article itself gives notice of the fact that a large part of the purchase money was still due. Upon the face of the instrument, it cannot be assumed that the premises were free and clear from incumbrance in respect to the purchase money. Referring to the same clause, respondent maintains that complainants are estopped of their lien from having participated in the sale of shares of stock of the company. It is urged that having agreed to invest the company with a clear title to the mine, and having sold shares of the company's stock upon that representation, they shall not be permitted to take the company's property, and thus destroy the value of the shares so sold. As already stated, the stock was sold by Haldeman or by the company; but, if the stock had been sold by complainants, there was in fact no representation as to the vendor's lien. As already explained, the agreement to convey without incumbrance relates to the state of the title at that time, and not to anything growing out of the sale itself. Mr. Justice Story says, (2 Eq. Jur. § 1224:)

"Generally speaking, the lien of the vendor exists, and the burden of proof is on the purchaser to establish that in the particular case it has been intentionally displaced or waived by consent of the parties. If, under all the circumstances, it remains in doubt, then the lien attaches."

There is much in the record, to which the learned and elaborate arguments of counsel have been addressed, which somewhat tends to show an intention on the part of complainants to waive their lien on the premises conveyed; but, in my judgment, it falls short of establishing the fact, and therefore I am constrained to enforce a lien for the purchase money. This, of course, excludes the part which was to be paid in stock of the company, and it has no reference to expenditures of complainant on the property since the conveyance. The bill prays for these expenditures, but they were not pressed in argument, and I see no rea-

son for allowing them. Probably counsel will be able to agree as to the amount of unpaid purchase money, and if they cannot do so it may be necessary to refer the cause for the purpose of ascertaining the amount.