**HELLYER COMMUNICATIONS,
INC., Plaintiff,**

v.

**WRC PROPERTIES, INC., Defendant.**

No. IP 95–386–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

June 25, 1997.

R.C. Richmond III, Sommer & Barnard, Indianapolis, IN, for Plaintiff.

V. Samuel Laurin III, Bose McKinney & Evans, Indianapolis, IN, for Defendant.

## DECISION

BARKER, Chief Judge.

In this action, Plaintiff, Hellyer Communications, Inc. (Hellyer) seeks reimbursement of an alleged overpayment of rents paid to Defendant, WRC Properties, Inc. (WRC). It also seeks reimbursement of its attorneys' fees and reformation of its commercial lease. Hellyer leases office space from WRC located in the 8500 Building at Keystone at the Crossing, Indianapolis, Indiana. On November 25 and 26, 1996, the Court held a bench trial in this matter. Post-trial briefing was completed in January 1997.

At trial, Hellyer called four witnesses: Jerry Hellyer (Hellyer), President of Hellyer; David Wieting (Wieting), Hellyer's Controller; James Vivian (Vivian), a lease auditor; and Charles Andrew Augustin (Augustin), a commercial real-estate tenant's broker in Indianapolis. Defendant presented six witnesses: Nicholas Stolatis (Stolatis),

Assistant Secretary at WRC; Zeke Riser (Riser), WRC employee and Property Manager of the 8500 building; Timothy C. Hull (Hull), a Senior Leasing Representative at Duke Realty Investments; Kathy DiBella (DiBella), an Interior Designer at CSO Interiors; Jim Bremner (Bremner), a corporate real estate developer; and Phil Armstrong (Armstrong), a Property Manager for Duke Realty. The parties stipulated to forty-six of the forty-seven exhibits presented at trial.

Having heard and considered the evidence, the Court hereby **DENIES** in full the relief sought by Hellyer, consistent with the following findings of fact and conclusions of law.

### Findings of Fact

On March 5, 1985, Hellyer and WRC entered into a lease (Initial Lease) for commercial office space in the 8500 Building at Keystone at the Crossing. Exhibit 3. The Initial Lease states that the "Rentable Area" leased is 4,377 square feet and incorporates by reference Initial Lease Exhibit A–3. *See* Ex. 3, Section 1.02(B). Initial Lease Exhibit A–3 defines "Rentable Area":

> As to each floor of the Building on which space is or will be leased to more than one tenant ..., Rentable Area attributable to each such lease shall be the total of the entire area included within the Leased Premises covered by such lease, being the area bounded by the inside surface of any exterior windows of the Building bounding such Leased Premises, the exterior of all walls separating such Premises from any public corridors or other public area on such floor, and the centerline of all walls separating such Leased Premises from other areas leased or to be leased to other tenants on such floor.

Ex. 3 (Initial Lease, Ex. A–3(B)). This definition of rentable area in effect describes the space that Hellyer was to lock-up each night, that is, its useable area of space. Exhibit A–2 to the Initial Lease is a diagram of the floor where Hellyer leased space and outlines in red the area covered by the leasehold. Omitted from this diagram is any common area of the floor upon which Hellyer was leasing space. Ex. 3 (Initial Lease, Ex. A–2). The Initial Lease provides a minimum annual rent of $58,128, calculated at a rate of "$13.28 per square foot," to be paid in monthly rental installments of $4,435. Ex. 3 (D & E). Section 3.02 of the Initial Lease also requires Hellyer to pay a proportionate share of the Building's operating expenses, called its "Annual Rental Adjustment." Ex. 3 (Initial Lease, Section 3.02).

The Initial Lease also requires Hellyer to notify WRC of any problem with the premises. Section 2.03 of the Initial Lease, entitled "Tenant's Acceptance of the Leased Premises," provides:

> Upon delivery of possession of the Leased Premises to Tenant as hereinbefore provided, Tenant shall execute a letter of understanding ... that Tenant has accepted the Leased Premises for occupancy and that the condition of the Leased Premises ... and the Building was at the time satisfactory and in conformity with the provisions of this Lease *in all respects*, except for any defects as to which Tenant shall give written notice to Landlord within thirty (30) days after such delivery. If Tenant takes possession of and occupies the Leased Premises, Tenant shall be deemed to have accepted the Leased Premises in the manner described in this Section 2.03, even though the letter of understanding provided for herein may not have been executed by Tenant.

Ex. 3 (Initial Lease, Section 2.03) (emphasis added).

The Initial Lease also includes an incorporation, or integration clause, which states:

> This Lease and the letter of understanding executed pursuant to Section 2.03 hereof contain all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement, understanding or representation pertaining to any such matter shall be effective for any purpose.

Ex. 3 (Initial Lease, Section 18.10).

Hellyer and WRC executed a total of four amendments to the Initial Lease. Hellyer negotiated the Initial Lease through a tenant's broker, but negotiated the Lease Amendments on its own. WRC negotiated

all the Lease documents through broker agents, primarily Duke Realty investments.

The First Amendment was executed on August 29, 1985. Ex. 6. It states that "Landlord and Tenant desire to add an additional 3,075 square feet to the Leased Premises." *Id.* The First Amendment substitutes an "Amended Exhibit A–2," replacing the original Exhibit A–2 diagram of leased space with a new diagram outlining the additional leased area in green. No building or floor common areas are outlined. In addition, the First Amendment states that the total "Rentable Area" is 7,452 square feet at the rental rate of $13.28 per square foot. Ex. 6 (New Section 1.02(D)). The First Amendment also provides that the Amendment "shall be incorporated into and made a part of the Lease, and all provisions of the Lease not modified or amended hereby shall remain in full force and effect." Ex. 6(2.6).

The Second Amendment was executed on December 16, 1988. Ex. 7. It substitutes a flat minimum annual rent and monthly rent installments due under the Lease. *Id.* The Second Amendment does not refer to any rate-per-square-foot as the basis for the amount of rent due, nor does it change the amount of space affected by its terms. *Id.* It does, however, provide that WRC will pay Hellyer to make improvements to the leased space. The provision entitled "Inducement to Lease" states, "Landlord hereby agrees to pay to Tenant the sum of Fifteen Thousand Dollars ($15,000.00) at the time of execution of this Second Lease Amendment for Tenant's use in future tenant finish improvements and other incidental expenses." *Id.* The amendment also provides that it "shall be incorporated into and made a part of the Lease, and all provisions of the Lease not expressly modified or amended hereby shall remain in full force and effect." *Id.*

The Third Amendment was executed on October 12, 1992 and provides for Hellyer "to add an additional 2,025 square feet to the Leased Premises," supplying an updated diagram of the space leased. Ex. 17. The new diagram, Third Amended Exhibit A–2, outlines in green the space rented by Hellyer from WRC and does not specifically denote any common areas of that floor. *Id.* This amendment describes the "Rentable Area" under the lease as 9,477 square feet, referencing the Amended Exhibit A–2. *Id.* It substitutes new amounts due as minimum annual rent and monthly rental installments, but does not specify the rent due as a function of a square-footage rate calculation. *Id.*

The Third Amendment also provides that WRC will pay $55,000 for improvements to the leased area and states that any improvement costs exceeding $55,000 shall be borne solely by Hellyer and amortized over the lease term at an interest rate of 10.5%. Further, "[t]he letter of understanding referred to in Section 2.03 of Article 2 [of the Initial Lease] shall include and be applicable to the Leased Premises, including the Additional Space," and these terms "shall be incorporated into and made a part of the Lease, and all provisions of the Lease not expressly modified or amended hereby shall remain in full force and effect." *Id.*

The Fourth Lease Amendment was executed on October 5, 1993. Ex. 22. It does not change the amount of space leased by Hellyer; the amendment does, however, amend the amount of rent due, taking into account payments for the tenant improvements, pursuant to the Third Amendment, costing above $55,000. *Id.* The Fourth Amendment incorporates itself "into ... the [Initial] Lease, and all provisions of the Lease not expressly modified or amended hereby shall remain in full force and effect." *Id.*

On the same day Hellyer executed the Fourth Lease Amendment, it engaged Leasehold Advisors Inc. (LAI) to measure the space it was occupying pursuant to its lease agreements with WRC. Ex. 22. LAI had previously solicited Hellyer's business by letter informing Hellyer that "[a] large percentage of ... clients are paying for space that they don't have. In fact, we found a substantial overcharge for one of your neighbors in the 8500 Building." Ex. 20.

LAI's audit uncovered discrepancies between the amount of space provided for in the lease and the amount of space Hellyer was actually occupying. The LAI audit disclosed that the *useable* space Hellyer re-

ceived pursuant to the Initial Lease was 4301 square feet, which was 76 square feet less than represented; pursuant to the First Amendment, the actual space leased was 7029 square feet, 423 square feet less than represented; and pursuant to the Third Amendment the leased space was 8946 square feet, 531 square feet less than represented. Ex. 26; *see also* Plaintiff's Ex. 47 (admitting that *useable* area let to Hellyer is less than represented in its Lease and subsequent amendments). Hellyer's contention at trial was that because of these shortages of space, the rental payments it had made to WRC exceeded its lease obligations and entitled Hellyer to a refund of $69,000 plus interest.

Hellyer bases its claim on its interpretation that the Lease and subsequent amendments obligate it to pay rent only for the space it actually used ("useable area"). WRC responds that Hellyer's obligation under the Lease and subsequent amendments includes the payment of rent for the space it used plus an add-on assessment for common space ("rentable area"), based on the fact that the term "rentable area" has an accepted meaning within the commercial real-estate industry that signifies that an add-on factor enhances the area actually occupied under the lease. Hellyer rejoins that the Lease and the amendments thereto make no mention of an add-on factor and are fully integrated, thus precluding reference to a meaning of rentable area not contained in the Lease documents.

### Conclusions of Law[1]

■ The starting point for resolving any contract dispute is the language of the contract itself. WRC concedes that Exhibit A–3, which formed a part of the Initial Lease, defined rentable area as useable area, that is, without including any mention of any add-on. But, WRC argues that the subsequent lease amendments effectively deleted Exhibit A–3 from the Lease, noting that the Initial Lease explicitly referred to Exhibit A–3 when discussing rentable area, while the subsequent Lease amendments referenced the amended Exhibits A–2.

Defendant is correct that the Lease Amendments refer to Exhibit A–2 and make no specific mention of Exhibit A–3. Yet, each of the Lease Amendments provides that "all provisions of the Lease not modified or amended hereby shall remain in full force and effect." Exs. 6, 7, 17, 22. Thus, the fact that there is no explicit mention of Exhibit A–3 does not effectively delete it from the Lease; rather it continues in full effect throughout the leasehold period. Indeed, even if Exhibit A–3 had been deleted, Exhibit A–2, as referenced in the amendments, would not have altered the Exhibit A–3 definition of rentable area because the A–2 diagrams outlined only useable area; no common areas were included in the Amended Exhibits A–2.

■ Nevertheless, WRC contends that the term "rentable area" has an accepted meaning within the commercial real-estate industry and that, even if Exhibit A–3 continued in effect throughout the Lease, Hellyer should have known that an "add-on factor" was assessed in addition to the area represented in the lease documents.

Rules of contract interpretation ordinarily confine the Court's analysis to the explicit terms of the instrument. However, the Restatement (Second) of Contracts permits evidence extrinsic to a contract to be considered in order to establish an industry usage which would have been understood by the contracting parties to form the backdrop to their agreement. Restatement (Second) of Contracts § 220 (1979); *cf.* IC 26–1–1–205 (defining usage of trade in sales of goods contracts as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts."); *see also Kaken Pharm. Co., Ltd. v. Eli Lilly & Co.,* 737 F.Supp. 510, 522 (S.D.Ind.1989) (discussing Corbin on Contracts and stating that "custom and usage is not parol to a written contract.").

---

1. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the Court.

As stated earlier, the dispute at bar turns primarily on the meaning of "rentable area," which WRC maintains was not defined exclusively in the lease documents. Thus, WRC asserts an industry understanding of the term rentable area, as meaning useable area plus an add-on factor, would not be parol to the Hellyer Lease, even though the literal definition in Lease Exhibit A–3 unambiguously defines rentable area to mean what is useable area. *Cf. Luedtke Eng'g Co. v. Indiana Limestone Co., Inc.*, 592 F.Supp. 75, 82 (S.D.Ind.1983), *aff'd*, 740 F.2d 598 (7th Cir.1984) (finding that a contract need not be ambiguous "for the admission of extrinsic evidence about the usage of trade").

In order for the Court to find that a term had a recognized meaning not contained in the four corners of the Lease documents, Defendant must establish that the term "rentable area" was clearly known in the commercial real-estate industry to such an extent that Hellyer should have understood that an add-on factor was being incorporated into its lease. *Cf. Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1084 (Ind.1993) (stating that it is sufficient that the "usage is one of which the parties are or should be aware"); *Urbach, Kahn & Werlin P.C. v. 250/PAS Assoc.*, 176 A.D.2d 151, 151, 574 N.Y.S.2d 36, 36–37 (1st Dep't 1991) (discussing defendant's burden to demonstrate that the phrase "rentable square feet" is "commonly understood within the commercial real estate rental industry" to have a meaning not necessarily obvious from the plain meaning of the words).

Trial testimony established that the term rentable area is presently understood by commercial real-estate developers and brokers in the Indianapolis area as meaning the space a tenant will lock-up at night plus an "add-on" factor which takes into account a portion of common-areas in the building. Bremner, an experienced real estate developer, testified that by 1985, 100% of commercial real-estate developers in Indianapolis understood that an add-on factor was used in determining rentable area, and by 1984, Duke Realty Investments would have understood the same. Hull, a Senior leasing representative at Duke Realty testified that it is

Duke's common practice to use an add-on factor to arrive at a rentable area definition.

Nevertheless, it was not established at trial that as a tenant negotiating his own commercial lease and amendments, Hellyer would have or should have understood the changing definition of the term "rentable area." Hellyer testified credibly that he did not know that the term included an add-on factor. Augustin, an experienced tenant's broker, testified at trial that even as late as 1992, there was no reason Hellyer should have known that the term rentable area referred to anything different from useable space, particularly in light of the language used in the Lease document, Augustin testified that as early as 1984, he and other good tenant brokers would have explained to a tenant that the term rentable area may include an add-on factor. Duke Realty Investments, WRC's broker for the 8500 Building, dealt directly with Hellyer—not with a tenant broker. Hull, a Duke broker, testified that he would sometimes explain the add-on factor incorporated in the term rentable area, but that he would not explain it to all tenants. Specifically, he testified that he could not recall telling Hellyer about an add-on factor and Hellyer testified that no one ever represented to him that the area he was leasing included an add-on factor.

Thus, WRC failed to establish that Hellyer should have known that, during the time he was negotiating his Lease and the Lease Amendments with WRC, the term rentable area could include an add-on factor. The Initial Lease and the Amendments accordingly must be considered as filly integrated as to the definition of rentable area.

■ Even if the Lease documents were not integrated so that the evolving meaning of the industry term "rentable area" were properly considered as part of the parties' lease, it is clear that an add-on factor was not used to arrive at the figures set out in the Lease documents. Indeed, from the evidence adduced at trial it is apparent that the difference between the square footage represented in the Lease documents and the actual space used by Hellyer arose as the result of a mutual mistake.

The extent of the discrepancy between the rentable-area figure contained in Hellyer's lease and the useable area it occupied is less than 2% in the Initial Lease [2] and approximately 6% under the First and Third Amendments. WRC, the successor in interest to the original building owner, does not actually contend that an add-on factor was used in order to explain the discrepancies discovered by LAI. In its Response to Plaintiff's Requests for Admissions and Interrogatories, Defendant states:

> WRC does not know with certainty who or how the Rentable Area ... was determined to be 7,452 square feet. It is believed that an architect or someone at the architect's request hand measured the Hellyer leased premises and an "add-on" factor was added to the result of the hand measurement.

Plaintiff's Ex. 47 (Answer to Interrogatory No. 3).

If an add-on factor had been used to calculate the rentable area represented in Hellyer's lease and subsequent amendments thereto, the difference between the area represented in the lease and the useable area Hellyer occupied would have been at least 11%, because according to Hull, an 11% add-on figure was *always* used in the 8500 Building. Armstrong, a Property Manager for Duke Realty, also testified that the 8500 Building used an 11% add-on. Bremner testified that the customary range for an add-on factor in the 8500 Building would have been 10–12%. DiBella, an interior designer in Indianapolis, calculated the allocation of common-space costs in the 8500 Building and determined that if an add-on factor were used there, it should be 13%.

Thus, the discrepancy between the useable space Hellyer received and the rentable space described in the Lease and Amendments thereto clearly appears to have result-ed from a mutual mistake, not from the imposition of an add-on factor designed to compensate the landlord for the expense of common areas.[3] As demonstrated by the evolving nature of the term "rentable area" and the actual amount of the discrepancy between the useable space Hellyer occupied and the area described in the Lease documents, the parties mutual mistake did not arise because an add-on factor was used in determining the amount of leased space. The parties were mutually mistaken about the amount of square feet contained in the space leased at the 8500 Building.

Given this mutual mistake between the parties, we next must determine how to value the differential between the amount of space the parties believed Hellyer would be occupying and how much it actually did occupy. Though the case at bar involves a dispute over rental values, we can safely and appropriately analogize to sales of land in order to discern the governing principles.

Regarding errors in area for the sale of land, Corbin, in his treatise on Contracts, states the rule as follows:

> A mistake as to the area of land that is the subject of a contract of sale may be such as to require remedy. If the contract was for the sale at a specified price per acre, justice may require an abatement in the price in proportion to the deficiency or an additional payment for the excess. Even though the agreed price was by the tract, and not by the acre, its amount may have been determined with reference to a basic assumption of a specific area. Whether or not such was the case is a question of fact, and may be a difficult one. When such was the assumption, and the error is material, the court should award an appropriate remedy. If the difference in area is so great as to cause a substantial degree of frustration of the purpose for which the

---

**2.** Plaintiff is not seeking relief pursuant to the Initial Lease, conceding that the variance discovered between its terms and the useable space leased is *de minimis. Waxman Indus., Inc. v. Trustco Dev. Co.,* 455 N.E.2d 376, 378–79 (Ind. App.1983).

**3.** This determination is strengthened by the fact that the Lease did apportion a fee to compensate WRC for overhead charges. *See* Ex. 3 (Initial Lease, Section 3.02) (providing that the "Annual Rental Adjustment" is the tenant's proportionate share of operating expenses, or the "amount of all of Landlord's direct costs and expenses ... in operating and maintaining the Building (including the Common Areas ... )").

land was bought, the buyer should be awarded a rescission if he seeks it. For less important differences, the remedy is proportionate abatement in price, this taking the form of restitution if the price has been paid. Sometimes, the remedy may well be a decree giving to the defendant a choice between rescission and his repairing the deficient by an abatement or a payment or even an additional conveyance.

If the sale was strictly by the tract, in gross, and the price was not determined at so much per unit of area, the fact that a mistake was made as to area will probably be held to be immaterial. If the mistake did not affect the price, and did not otherwise cause the making of the sale, the contract stands as made.

Arthur L. Corbin, *Corbin on Contracts* § 604, at 550 (1952).

In *Wolcott v. Frick*, 40 Ind.App. 236, 238, 81 N.E. 731 (1907), the Indiana Appeals Court wrestled with a problem similar to the one *sub judice*. Defendant sold what he believed to be an 850-acre farm at a price of $60 per acre. In fact, the farm contained only 780 acres, approximately 8% less than the plaintiff paid for. The court stated:

> In case one purchases real estate at a given price per acre and the purchaser and seller have a common belief that there is of said real estate a given number of acres, and the purchaser pays the purchase price therefor in full, and it is ascertained afterwards that there was a gross shortage in the acreage of said real estate that was in nowise contemplated by the seller and the purchaser, the purchaser may recover at the contract price per acre for the gross shortage in acreage.

40 Ind.App. at 238, 81 N.E. 731.

In *McMahan v. Terkhorn*, 67 Ind.App. 501, 116 N.E. 327 (1917), a discrepancy was discovered in excess of the amount represented in the contract for the sale of land. The Indiana Court of Appeals held that "[s]ales in gross may be subdivided into various subordinate classifications, [one of which is those] sales which, though technically deemed and denominated sales in gross, are, in fact, sales by the acre and so understood by the parties." *McMahan*, 116 N.E. at 329

(quoting *Harrison v. Talbot*, 32 Ky. 258, 2 Dana 258 (1834)). The *McMahan* court stated that when a sale is in fact by the acre, "an unreasonable surplus or deficit may entitle the injured party to equitable relief unless by his conduct he has waived or forfeited his equity." *McMahan*, 116 N.E. at 329.

▪ With these principles in mind, the Court next addresses the issue whether the Second, Third and Fourth Lease Amendments were understood by Hellyer and WRC to be based on square footage or on the gross amount of leased space. (The First Lease Amendment states explicitly an amount due per rentable square foot.) WRC maintains that the Court should exclude evidence parol to the Lease and the Amendments in deciding this issue, arguing that the Integration Clauses together with the contract doctrine of integration operate to exclude evidence extrinsic to the contract documents.

▪ Ordinarily, if an agreement is "completely integrated, constituting a final and complete expression of all of the parties' agreements, then evidence of prior or contemporaneous written or oral statements and negotiations cannot operate to either add to or contradict the written agreement." *Franklin v. White*, 493 N.E.2d 161, 167 (Ind. 1986); *see also Stack v. Commercial Towel & Uniform Service, Inc.*, 120 Ind.App. 483, 91 N.E.2d 790, 794 (1950) (en banc) (when a deed is executed "all prior agreements whether oral or written, are merged in the latter instrument and any variance or inconsistencies therein must yield to the language of the last document ...."). However, that is only true in the absence of fraud or mistake. *Franklin*, 493 N.E.2d at 164. Extrinsic evidence is admissible to determine the parties' actual intention in entering into an agreement when it is clear that there has been a mutual mistake. *Id.*, at 164 ("[t]he parol evidence rule has no application to exclude evidence of mistake"); *Brames v. Crates*, 399 N.E.2d 437, 442 (Ind.App.1980) ("the parol evidence rule does not apply to a situation where, by reason of mutual mistake of fact, instruments have been so framed as not to express the true agreement of the parties."). Here, the parties mutually erred in their

understanding of how many square feet were contained in the area leased by Hellyer, making it necessary to determine the parties' understanding of how their space was to be leased. Consequently, the Court must consider evidence from the negotiations of the Second, Third and Fourth Lease Amendments. *See also Koch v. Bird,* 174 Mich. 594, 140 N.W. 919, 920 (1913) ("where the claim is that of a mutual mistake, it is not only competent but it is the duty of the court to look into the testimony as to all of the surrounding circumstances and conversations leading up to the sale to ascertain and determine whether the sale was by the acre or in gross.").

▮ The evidence adduced at trial clearly established that Hellyer and WRC understood that their's was a lease agreement arrived at on the basis of square footage. In a November 21, 1988 letter to Hellyer discussing the proposed Second Lease Amendment, rent is described in terms of "$7.75 per rentable square foot—years 1 and 2; $15.50 per rentable square foot—years 3, 4, and 5." Ex. 8. An August 5, 1992 letter to Hellyer proposing the terms for the Third Amendment represents the rent due for "Months 1– 60 $12.00 per rentable square foot." Ex. 15. No exhibits were tendered which evidence the parties' understanding of the terms in the Fourth Amendment, but David Witting, Hellyer's Controller, testified that he reviewed the proposals for the Second through Fourth Lease Amendments and that each of the Amendments was negotiated on a price-per-square-foot basis with no reference to a flat price-per-month or year calculation. Tim Hull, a Duke broker, testified that it was his common practice to use a rate-times-rentable-square-foot calculation when making proposals to tenants. From this, the Court concludes that Hellyer and WRC negotiated and understood the rent fixed in their Lease and Amendments as a function of a price-per-square-foot.

▮ Hellyer argues that because the parties negotiated their Lease on a square-foot basis and because there was a mutual mistake in WRC's favor regarding the amount of space Hellyer was to occupy pursuant to the Lease, Hellyer is entitled to a rebate of the rent it has consequently overpaid. Nevertheless, a refund of rents-tendered does not automatically flow from a mutual mistake:

> When it is evident that there has been a gross mistake as to quantity, and the complaining party has not been guilty of any fraud or culpable negligence, nor has otherwise impaired the equity resulting from the mistake, he *may* be entitled to relief from the technical or legal effect of his contract, whether it be executed or only executory.

*Solinger v. Jewett,* 25 Ind. 479, 480–81 (1865) (quoting *Harrison v. Talbot,* 32 Ky. 258, 2 Dana 258 (1834)) (emphasis added). WRC argues that Plaintiff cannot recover under the circumstances in this case because Hellyer has impaired the equity resulting from the mistake and thus, its claims are barred by the statute of limitations and laches.

▮ We have previously ruled that the statute of limitations in this action is six years. *See* Entry, June 8, 1995. Furthermore, there is no question that Hellyer did not discover the discrepancy in the amount of area it was leasing until October 1993. *Cf. Habig v. Bruning,* 613 N.E.2d 61, 63 (Ind. App.1993) (applying "discovery rule" to commence statute of limitations period). Similarly, there is no question that Hellyer had possession of the space it was leasing at all relevant times and that it was always within Hellyer's means to measure the space it was leasing. The doctrine of laches may bar a plaintiff's claim if the defendant can show: "(1) plaintiff's inexcusable delay in asserting his or her rights, (2) plaintiff's implied waiver arising from knowing acquiescence in existing conditions, and (3) prejudice to the defendant due to the delay." *Habig,* 613 N.E.2d at 65. Laches " 'may bar a plaintiff's claim even though the applicable statute of limitations has not yet expired if the laches are of such character as to work an equitable estoppel (which contains the additional element of reliance by the defendant).' " *Id.* (quoting *Shearer v. Pla–Boy, Inc.,* 538 N.E.2d 247, 254 (Ind.App.1989)). The party asserting laches as a defense must prove it by a preponderance of the evidence. *Clay v. State,* 508 N.E.2d 800, 803 (Ind.1987).

Laches is "based upon the legal maxim [that] equity aids the vigilant, not those who slumber on their rights." *Alber v. Standard Heating & Air Conditioning* 476 N.E.2d 507, 509 (Ind.App.1985). Under the circumstances in this case, we must conclude that Hellyer's delay in discovering the discrepancy in its leased space and filing suit thereupon is inexcusable.

■ At trial, Augustin, a tenant's broker, testified that tenants ordinarily do not measure their space, choosing instead to rely upon the figures and computations provided to them by their landlords. Yet Hellyer, who negotiated its rent on a price-per-rentable-square-foot of area, was obligated to assure itself of the accuracy of the lease terms. Once in possession of the space leased, its reliance upon WRC's figures was no longer justifiable. *Cf. Thatcher Eng'g Corp. v. Bihlman*, 473 N.E.2d 1022, 1025 (Ind.App.1985) (stating that there is no justifiable reliance where information is " 'equally within the knowledge or the means of acquiring knowledge possessed by both parties' ") (quoting *Welsh v. Kelly–Springfield Tire Co.*, 213 Ind. 188, 12 N.E.2d 254, 256 (1938) (quoting, in turn, Pomeroy, Equity Jurisprudence, § 892 (2d ed.))). Hellyer does not contend that it could not measure its space at any time during its tenancy nor that it somehow did not believe it had the right to measure. Although constructive knowledge will not suffice as a predicate for laches, the means of knowledge combined with a duty to exercise those means are an adequate basis for finding inexcusable delay. *See e.g., Perry v. State of Indiana*, 512 N.E.2d 841, 844 (Ind. 1987) (stating that laches cannot rest on constructive knowledge, and distinguishing the insufficient "notice which is imputed from the mere passage of time in post-conviction proceedings" from the sufficient "[i]nquiry notice which is imputed from objective facts, such as the open and notorious use of land by an adverse claimant"); *Mishawaka, St. Joseph Loan & Trust Co. v. Neu*, 209 Ind. 433, 196 N.E. 85, 90 (1935) ("[m]eans of knowledge with the duty of using them are, in equity, equivalent to knowledge itself") (quoting *Cordova v. Hood*, 84 U.S. 1, 17 Wall. 1, 21 L.Ed. 587 (1872)); *see also Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir.1990), *cert. denied*,

501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991) (concluding that laches barred claim challenging state election procedure where nature of claim requires expeditious prosecution and before filing claim, plaintiff waited eleven weeks after ballots were public record and two weeks after it had actual knowledge of alleged irregularity); *Simon v. Auburn, Bd. of Zoning Appeals*, 519 N.E.2d 205, 214 (Ind.App.1988) (determining that doctrine of laches applies where plaintiffs "had knowledge or the means of acquiring knowledge of the technical irregularities they now allege").

Hellyer had a duty to inspect its premises to ensure that they conformed with the Lease and to notify WRC of any problems. Initial Lease Section 2.03. Hellyer maintains that Section 2.03 only pertained to the Initial Lease and the tenant improvements made to the leased space, but was not generally in effect as a term of the Lease. This argument fails in the face of the Integration Clause—the same reason WRC's prior argument about Lease Exhibit A–3 was unavailing: the Amendments specifically provide that "all provisions of the Lease not modified or amended hereby shall remain in full force and effect." Exs. 6, 7, 17, 22. Section 2.03 was not deleted and thus remained in effect, obligating Hellyer to inspect its leased space within thirty days after executing the Lease documents. In addition, Hellyer's attempt to avoid the waiver provision by claiming that the square footage discrepancy was not a "condition" under the leasehold, is similarly unavailing, given that Section 2.03, by its very terms, states that, unless Hellyer notified WRC it would be deemed to have found the leased space "satisfactory and in conformity with the provisions of this Lease *in all respects ....* " Ex. 3 (Initial Lease, Section 2.03) (emphasis added).

Hellyer must be deemed to have acquiesced in the conditions as they existed at the 8500 Building, thus satisfying the second laches requirement. Hellyer's damage claim is premised solely on the claim that it did not receive the office space it thought it had contracted and paid for—yet, it occupied and possessed the 8500 Building premises without ever measuring the space it had leased.

The terms of its Lease imposed on Hellyer an obligation to verify the lease terms if it wanted to be compensated for any possible discrepancies. *Cf. Waxman,* 455 N.E.2d at 378 ("A party who accepts a defective performance of a contract is liable for the contract price. One may, by reason of estoppel or ratification, be prevented from claiming that a lease is defective or invalid.") (internal citation omitted).

Finally, laches requires prejudice to the defendant due to the delay. WRC proved by a preponderance of the evidence that even though the rental price was calculated on a price-per-square-foot basis, other aspects of the Lease and the Amendments were calculated as a function of and were absolutely dependent on the total amount of money WRC expected to receive from Hellyer. For example, in the Second Lease Amendment, no space was added to the area rented, but as an "Inducement to Lease," WRC agreed to "pay [Hellyer] the sum of Fifteen Thousand Dollars ($15,000.00) at the time of execution of this Second Lease Amendment for Tenant's use in future tenant finish improvements and other incidental expenses." Ex. 7. And in the Third Lease Amendment, WRC committed to pay $55,000.00 for tenant improvements to the space leased by Hellyer. Ex. 17. Mr. Stolatis testified that WRC would not have committed those amounts of money if the monthly rent it was to receive from Hellyer was less than the bottom-line represented in the Lease documents. He acknowledged that, had it been known that Hellyer was occupying less space than represented in the Lease, the rent-due might have been reduced. But Mr. Stolatis also testified that WRC's cost-benefit analysis would definitely have changed as a function of a reduced amount of rent from Hellyer. In other words, WRC would not have paid the same amount of money for tenant improvements had Hellyer's rent been reduced. Therefore, WRC would indeed be prejudiced if it were required to rebate rent monies to Hellyer after it calculated other parts of the Lease documents, most notably the $70,000 in tenant improvements, in reliance upon and as a function of the total amount of rent it received from Hellyer.

WRC would also be prejudiced from a refund of rent monies because the mistake in square footage leased to Hellyer was not an isolated use of the mistaken square footage numbers. WRC relied upon the erroneous area numbers to its detriment because it calculated the Building's common area maintenance (CAM) charge as a function of what it believed to be the total area in the 8500 Building. If the CAM charges were recalculated using the corrected and smaller amount of space in the Building, WRC would have, in fact, been undercompensated by Hellyer for the CAM charges through the course of Hellyer's tenancy. Hellyer argues that WRC is not entitled to adjust its CAM calculations because Exhibit A–3 defines the Building's total rentable area as whatever WRC "deemed to be" the amount of square feet and certified as the Building's area. Hellyer argues that WRC is not entitled to an additional CAM-payment even if the space were deemed an erroneous amount because the Lease does not require that WRC correctly "deem" the Building's total area. Yet, it would be inequitable, at best, if Hellyer were able to recover when the mutual mistake in leased space worked to its disadvantage, but WRC was not compensated when the mistake worked to its disadvantage. In this way too WRC would be prejudiced if Hellyer were permitted to recover on its claim for rents paid.

Thus, the Court concludes that Hellyer is guilty of laches which bars its entitlement to recover on its claims. Hellyer seeks equitable relief based on lease terms long in effect and long-relied upon by both parties While we cannot disagree with Hellyer that it negotiated its lease on a price-per-square-foot basis and that a mutual mistake was made regarding the area Hellyer received under its Lease, Hellyer nevertheless has enjoyed the benefit of its bargain with WRC: it received the commercial space it sought to lease and it was provided monetary inducements by WRC to lease and to make improvements to the leased premises. By seeking a rebate for rents paid, Hellyer focuses upon only a narrow portion of its financial transactions with WRC, seeking to adjust a single strand in a complex contractual relationship, while deny-

ing that the entire fabric will, as a consequence, need refashioning.[4]

Hellyer inexcusably delayed in measuring its space and seeking relief for the discrepancies discovered only in October 1993. Hellyer had unfettered opportunity to measure its space and, in fact, engaged LAI on the very date it executed the Fourth Lease Amendment. Although Hellyer maintains that it engaged LAI not believing there would be a discrepancy under the Lease, it received notice shortly thereafter of the square-footage difference, yet it waited another sixteen months before filing this claim—only then providing WRC with its first notice of the discrepancy.[5]

"All rules in equity are sufficiently elastic to permit justice and equity to be done in each particular case." *Mishawaka,* 196 N.E. at 90. Justice and equity require in this case that Hellyer's request for relief be denied in full. Hellyer is entitled neither to recover rents owed and paid to WRC, nor attorneys' fees incurred in this litigation. The Court will not reform the parties' Lease, which, in fact, expires this year; the parties are left to the Lease terms for which they previously contracted.

---

4. Rescission would be an untenable remedy in this case: the Lease documents under which the parties have been operating have been in effect too long to suggest that the parties could return easily or effectively to their *ex ante,* status quo positions.

5. Hellyer maintains that this delay was also excusable because Hellyer was, during those sixteen months, experiencing fume problems in the 8500 office-space. Hellyer maintains that it was

consequently considering a constructive eviction claim and once it determined not to pursue that claim, it promptly filed its claim for overpayment of rents. Yet Hellyer offered evidence of only eight occurrences of fume problems (a maximum of one occurrence every two months) and no acceptable justification for completely failing to notify WRC of the discrepancies uncovered by LAI.